No. 55,845

STATE OF KANSAS, *Appellant,* v. RICK L. DESKINS, *Appellee.*

(673 P.2d 1174)

530

Opinion filed December 2, 1983.

*Frank A. Caro, Jr.,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, *Gene M. Olander,* district attorney, and *Arthur R. Weiss,* assistant district attorney, were with him on the brief for appellant.

*Hal E. Des Jardins,* of Topeka, argued the cause for appellee.

The opinion of the court was delivered by

HOLMES, J.: This is an interlocutory appeal, pursuant to K.S.A. 22-3603, by the State of Kansas from an order of the district court suppressing certain evidence in a prosecution for driving while under the influence of alcohol (DUI) and possession of marijuana.

Defendant, Rick L. Deskins, was arrested after his automobile was stopped by police officers at a roadblock ostensibly set up for the purpose of checking drivers' licenses. Prior to trial defendant filed a motion to suppress all evidence of DUI and the small bag of marijuana found in the automobile glove-box after defendant's arrest. The court found the roadblock to be an unconstitutional violation of the Kansas Constitution Bill of Rights § 15, the Kansas equivalent to the Fourth Amendment to the United States Constitution. The trial court found as a matter of fact, and counsel for the State candidly conceded in argument before this court, that the roadblock was set up to catch drunk drivers and that the checking of drivers' licenses was a facade for such purposes. Therefore, the narrow question before this court is whether the use of a DUI roadblock under the factual situation

existing in this case is an unconstitutional infringement upon a person's right to be free from unreasonable searches and seizures under the Kansas Bill of Rights and the Fourth Amendment. In considering the application of § 15 of the Kansas Bill of Rights to any particular factual situation, its scope is identical to that of the Fourth Amendment. *State v. Wood,* 190 Kan. 778, 788, 378 P.2d 536 (1963).

At 10:00 p.m. on November 20, 1982, thirty-five to forty police officers from the Kansas State Highway Patrol, the Shawnee County Sheriff's Office, and the Topeka Police Department, set up a roadblock at the intersection of 45th Street and Topeka Avenue in Topeka, ostensibly to check drivers' licenses. All vehicles proceeding both north and south on Topeka Avenue were stopped and their drivers checked to determine if they were carrying valid licenses. Mr. Deskins was driving south on Topeka Avenue around 1:20 a.m. the next morning, and was stopped in the check lane. A state trooper approached the car and requested Deskins' license which was found to be in order and at that point he had satisfied all the requirements for the license check.

The officer had not observed the defendant operate the automobile, as it was standing still in a line of stopped vehicles when the officer approached, and the officer, prior to the vehicle being stopped, had no facts or knowledge which would constitute probable cause or even a reasonable suspicion that defendant had committed, was committing, or was about to commit a violation of Kansas criminal statutes. However, from his position outside Deskins' car, the trooper "could smell a strong odor of alcohol, some type of alcoholic beverage on [defendant's] breath and his eyes were kind of bloodshot and watery." The officer asked Deskins to step out of the car to take a sobriety and coordination test. His performance was less than satisfactory to the officer and, as the officer was of the opinion defendant was under the influence of alcohol, he arrested defendant and read him the *Miranda* rights. The trooper moved defendant to a squad car and another officer, with defendant's permission, moved his car out of the check lane. While defendant remained in the police car, one of the officers searched the defendant's automobile and found in the glove-box a plastic bag containing marijuana.

Defense counsel filed a motion to suppress all evidence gathered after defendant's vehicle was stopped, on grounds the roadblock was designed not to check drivers' licenses but solely to "stop all vehicles for the purpose of arresting individuals that the police suspected of driving while intoxicated." Defendant claimed the roadblock stop violated his constitutional rights under the Fourth Amendment. At the hearing on the motion, the arresting officer testified that during a briefing before establishing the roadblock it was made clear to the officers that if, after stopping someone in the lane, they smelled alcohol or had any "suspicion" of drinking, they could question the driver further. The State, as previously indicated, has conceded the primary purpose of the roadblock was to catch drunk drivers, and this appeal will be considered in that light, although incidental to that purpose arrests were also made for a number of other reasons, including some involving license violations.

There can be no doubt that the stopping of a motorist for the sole purpose of checking for a valid driver's license, let alone to seek evidence of the commission of a crime such as DUI, constitutes a "seizure" under the Fourth Amendment. In *Union Pacific Railway Co. v. Botsford,* 141 U.S. 250, 35 L.Ed. 734, 11 S.Ct. 1000 (1891), the court stated:

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *141 U.S. at 251.*

The Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868 (1968), was faced with a Fourth Amendment challenge to the admission of evidence recovered in a "stop and frisk" encounter between police and defendant Terry. The defendant, while walking on the street, had been stopped by a veteran police officer merely on the officer's suspicion that Terry and his companions might be considering a robbery. For his own protection the officer patted down the outer clothing of the men and found Terry to be carrying a pistol. Terry was later convicted of carrying a concealed weapon and the case eventually made its way to the Supreme Court on the question of whether his rights under the Fourth Amendment had been violated and whether the evidence recovered in the "stop and frisk" should have been suppressed. In its opinion the Court stated:

"It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime — 'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U.S. at 16.

In *Delaware v. Prouse*, 440 U.S. 648, 59 L.Ed.2d 660, 99 S.Ct. 1391 (1979), the Court stated:

"The Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief." 440 U.S. at 653.

In *Prouse,* upon which the State relies heavily, the court stated the facts in the following manner:

"At 7:20 p.m. on November 30, 1976, a New Castle County, Del., patrolman in a police cruiser stopped the automobile occupied by respondent. The patrolman smelled marihuana smoke as he was walking toward the stopped vehicle, and he seized marihuana in plain view on the car floor. Respondent was subsequently indicted for illegal possession of a controlled substance. At a hearing on respondent's motion to suppress the marihuana seized as a result of the stop, the patrolman testified that prior to stopping the vehicle he had observed neither traffic or equipment violations nor any suspicious activity, and that he made the stop only in order to check the driver's license and registration. The patrolman was not acting pursuant to any standards, guidelines, or procedures pertaining to document spot checks, promulgated by either his department or the State Attorney General. Characterizing the stop as 'routine,' the patrolman explained, 'I saw the car in the area and wasn't answering any complaints, so I decided to pull them off.' . . . The trial court granted the motion to suppress, finding the stop and detention to have been wholly capricious and therefore violative of the Fourth Amendment." pp. 650-651.

The Delaware Supreme Court affirmed the trial court and the United States Supreme Court affirmed with only Justice Rehnquist dissenting. The majority opinion, in its conclusion, stated:

"Accordingly, we hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment. *This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. We hold only that persons in automobiles on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers."* p. 663. (Emphasis added.)

In reaching its ultimate conclusion that the random stopping of a motorist without at least some reasonable suspicion that a violation may be occurring violates the Fourth Amendment, the court relied heavily on its earlier opinions in what are referred to as the border patrol cases. The Court stated:

"The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order ' "to safeguard the privacy and security of individuals against arbitrary invasions. . . ." ' (Citations omitted.) Thus, the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interest. Implemented in this manner, the reasonableness standard usually requires, at a minimum, that the facts upon which an intrusion is based be capable of measurement against 'an objective standard,' whether this be probable cause or a less stringent test. In those situations in which the balance of interests precludes insistence upon 'some quantum of individualized suspicion,' other safeguards are generally relied upon to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field." pp. 653-55.

"We have only recently considered the legality of investigative stops of automobiles where the officers making the stop have neither probable cause to believe nor reasonable suspicion that either the automobile or its occupants are subject to seizure under the applicable criminal laws. In *United States v. Brignoni-Ponce*, [422 U.S. 873 (1975),] Border Patrol agents conducting roving patrols in areas near the international border asserted statutory authority to stop at random any vehicle in order to determine whether it contained illegal aliens or was involved in smuggling operations. The practice was held to violate the Fourth Amendment, but the Court did not invalidate all warrantless automobile stops upon less than probable cause. Given 'the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border,' 422 U.S., at 881, the Court analogized the roving-patrol stop to the on-the-street encounter addressed in *Terry v. Ohio*, [392 U.S. 1 (1968),] and held:

'Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.' 422 U.S., at 884 (footnote omitted).

Because 'the nature of illegal alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators,' *id.*, at 883, 'a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference.' *Ibid.*

"The constitutionality of stops by Border Patrol agents was again before the Court in *United States v. Martinez-Fuerte*, [428 U.S. 543 (1976),] in which we

addressed the permissibility of checkpoint operations. This practice involved slowing all oncoming traffic 'to a virtual, if not a complete, halt,' 428 U.S., at 546, at a highway roadblock, and referring vehicles chosen at the discretion of Border Patrol agents to an area for secondary inspection. See *id.*, at 546, 558. Recognizing that the governmental interest involved was the same as that furthered by roving-patrol stops, the Court nonetheless sustained the constitutionality of the Border Patrol's checkpoint operations. The crucial distinction was the lesser intrusion upon the motorist's Fourth Amendment interests:

> '[The] objective intrusion — the stop itself, the questioning, and the visual inspection — also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion — the generating of concern or even fright on the part of lawful travelers — is appreciably less in the case of checkpoint stop.' [428 U.S.] at 558.

Although not dispositive, these decisions undoubtedly provide guidance in balancing the public interest against the individual's Fourth Amendment interests implicated by the practice of spot checks such as occurred in this case. We cannot agree that stopping or detaining a vehicle on an ordinary city street is less intrusive than a roving-patrol stop on a major highway and that it bears greater resemblance to a permissible stop and secondary detention at a checkpoint near the border. In this regard, we note that *Brignoni-Ponce* was not limited to roving-patrol stops on limited-access roads, but applied to any roving-patrol stop by Border Patrol agents on any type of roadway on less than reasonable suspicion. See 422 U.S., at 882-883; *United States v. Ortiz*, 422 U.S. 891, 894 (1975). We cannot assume that the physical and psychological intrusion visited upon the occupants of a vehicle by a random stop to check documents is of any less moment that that occasioned by a stop by border agents on roving patrol. Both of these stops generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority. Both interfere with freedom of movement, are inconvenient, and consume time. Both may create substantial anxiety. For Fourth Amendment purposes, we also see insufficient resemblance between sporadic and random stops of individual vehicles making their way through city traffic and those stops occasioned by roadblocks where all vehicles are brought to a halt or to a near halt, and all are subjected to a show of the police power of the community. 'At traffic checkpoints the motorist can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.' [422 U.S.] at 894-895, quoted in *United States v. Martinez-Fuerte*, 428 U.S. at 558." pp. 655-657.

"When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations — or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered — we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent. *Almeida-Sanchez v. United States,* 413 U.S. 266, 270 (1973); *Camara v. Municipal Court,* 387 U.S., at 532-533." p. 661

Thus it is clear that the random stop to check a motorist's driver's license without probable cause or at the very least some reasonable suspicion, which a majority of this court approved in *City of Overland Park v. Sandy*, 225 Kan. 102, 587 P.2d 883 (1978), is a violation of the Fourth Amendment rights of the driver and that holding in *Sandy* to the contrary has clearly been overruled by *Prouse*. Since its decision in *Prouse*, the Supreme Court has not had an opportunity to explore the issue further in the context of vehicle roadblocks.

However, in *Brown v. Texas*, 443 U.S. 47, 61 L.Ed.2d 357, 99 S.Ct. 2637 (1979), the court relied upon part of its Fourth Amendment analysis and approach taken in *Prouse*. *Brown* held a Texas statute unconstitutional under the Fourth Amendment where it allowed police to detain a person, and require that person to identify himself, even where the officers lacked probable cause or any reasonable suspicion to believe that defendant was engaged or had engaged in criminal conduct. 443 U.S. at 53. In the course of its opinion, the Court said:

"A central concern in balancing [the competing considerations of public need and individual liberty] has been to assure than an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. (Citations omitted.) To this end, the Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Brown*, 443 U.S. at 51.

Several states have considered the issue in connection with driver's license check roadblocks or in some cases more candidly described as DUI roadblocks. It is obvious, without resort to the record or otherwise, that the problem of the drunk driver is one of enormous magnitude affecting every citizen who ventures forth upon the streets and highways. There can be no doubt that there is an overwhelming public and governmental interest in pursuing methods to curtail the drunk driver. Most states, however, which have considered the validity of roadblocks to "check drivers' licenses and auto registration" or to check for drunk drivers have found the methods used to be violative of Fourth Amendment rights and as failing to meet the implied tests set forth in the extensive dicta in *Prouse*. The use of a DUI roadblock has principally two purposes: (1) to apprehend and remove

the drunk driver from the streets before injury or property damage results, and (2) in serving as a deterrent to convince the potential drunk driver to refrain from driving in the first place. As a fringe benefit the DUI roadblock also serves to disclose other violations pertaining to licenses, vehicle defects, open containers, etc.

In *State v. Olgaard*, 248 N.W.2d 392 (S.D. 1976), the South Dakota Supreme Court held "that unless authorized by prior judicial warrant, the establishment of a roadblock for the purpose of investigating all motorists for possible liquor law violations constitutes an unconstitutional seizure within the meaning of the Fourth Amendment." 248 N.W.2d at 395. In contrast to *United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L.Ed.2d 1116, 96 S.Ct. 3074 (1976), the court found that the roadblock in *Olgaard* was not at a permanent location; there was no notice of the roadblock, "for by its very nature the roadblock was set up to stop without prior warning, and perforce by surprise, all motorists . . ."; and, absent evidence that the decision to establish the roadblock was made by anyone other than officers in the field, "the roadblock in question had certain characteristics of a roving patrol, a type of intrusion into a motorist's privacy interest that was held unconstitutional in *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 . . . ." 248 N.W.2d at 394-95. Although *Olgaard* was decided before *Prouse*, the South Dakota court relied heavily on the border patrol cases and recognized some of the same factors later considered in *Prouse*. The court was concerned with the lack of any permanent location for the roadblock resulting in what it termed "certain characteristics of a roving patrol," lack of notice and possible abuse of discretion by officers in the field.

Arizona reached the same result in *State ex rel. Ekstrom v. Justice Ct. of State*, 136 Ariz. 1, 663 P.2d 992 (1983). The Arizona Supreme Court said:

"[W]e cannot agree that the intrusion generated by the Kingman roadblocks was minimal. The record establishes that the Kingman checkpoints involved a not insubstantial amount of discretionary law enforcement activity and that the manner in which the roadblocks were operated was somewhat irregular. The roadblocks were set up at the discretion of a local highway patrolman and were operated without specific directions or guidelines. Officers were uncertain whether they should simply question the occupants of motor vehicles or whether they should seize the opportunity to cursorily search the vehicles for evidence of

a violation. Motorists were taken by surprise, not having had prior notice of the location and purpose of the checkpoints. We find present in the Kingman operation the grave danger that such discretion might be abused by the officer in the field, a factor which caused the Court in *[Delaware] v. Prouse, supra,* much concern." p. 5.

A scholarly and well-reasoned concurring opinion in *Ekstrom* explored the conditions under which a roadblock checkpoint might pass constitutional scrutiny, and noted that advance warning of a roadblock by notice on the highway and publicity in the media would not only increase the efficacy of a deterrent roadblock but would also limit the resulting intrusion on individual interests, because those being stopped would anticipate and understand what was occurring.

In *Commonwealth v. McGeoghegan,* 389 Mass. 137, 449 N.E.2d 349 (1983), the facts were quite similar to those in the instant case:

"McGeoghegan was in a motor vehicle that had been stopped at a roadblock, that the police asked him for his 'papers,' that he showed signs of having been drinking and was taken from his vehicle to a nearby van, where he took and failed a breathalyzer test, and that he was arrested and his vehicle was towed away. It was also agreed that the police had no cause initially to stop McGeoghegan 'except that he was one . . . of two hundred or more motorists that were stopped as they passed the roadblock stoppoint.'

"There are additional undisputed facts. The roadblock was conducted by the Revere police department on North Shore Road and Mills Avenue in that city on the evening of January 15, 1982. This was the result of a plan formulated earlier that day by the police chief and four subordinates. The area of the roadblock was a heavily travelled highway. The main purpose of the roadblock was to detect drunk drivers." pp. 138-39.

The court, in reaching its conclusion, relied upon findings of the trial court that "the roadblock area was poorly illuminated and unsafe for motorists, that the mechanics of the roadblock were left to the discretion of the officers carrying it out, that the officers used their own discretion in deciding which cars to stop, and that motorists were backed up on the highway for at least two-thirds of a mile." 389 Mass. at 144.

The Court of Appeals of Texas in *Koonce v. State,* 651 S.W.2d 46 (Tex. Crim. App. 1983), found evidence recovered in the search of a car at a driver's license roadblock inadmissible as the State failed to show the initial stop was reasonable under the guidelines of *Prouse.* The court stated:

"Without evidence that an objective, non-discretionary procedure was being used, we find that the initial stop of appellant's automobile was unreasonable,

and thus, the fruit of that stop and subsequent search was tainted." 651 S.W.2d at 48.

New Jersey, on the other hand, has taken an opposite position from that of a majority of the states that have confronted the issue. In *State v. Coccomo,* 177 N.J. Super. 575, 427 A.2d 131 (1980), the court was again faced with a motion to suppress evidence recovered at a driver's license check roadblock. The roadblock was evidently conducted by township police under a written policy of the Roxbury township police department. The facts were similar to those in the other cases we have discussed except that the procedure was to stop every fifth vehicle while the roadblock was in operation. In distinguishing *Prouse* the court stated:

"In prohibiting random, discretionary vehicular stops the Supreme Court did not 'preclude the [states] from developing methods for spot checks that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock type stops is one possible alternative.' 440 U.S. at 663, 99 S.Ct. at 1041." 177 N.J. Super. at 581.

The court went on to state:

"No one can deny the State's vital interest in promoting public safety upon our roads by detecting and prosecuting drunk drivers. These drivers are a threat to other motorists, to pedestrians and to themselves. Unfit drivers should be identified and removed from the highways. However, there is obviously a competing interest to be considered. Whether the practice adopted in Roxbury Township is reasonable depends upon a balancing of the State's interest in promoting highway safety against the individual motorist's interest in his expectation of privacy." 177 N.J. Super. at 582.

The court found that the roadblocks were operated during early morning hours when traffic was light, that the manner of stopping vehicles was done safely and was designed to reduce anxiety on the part of the motorists, that the Roxbury police were following specific, defined standards and that the system was completely objective in its operation. The court held:

"After balancing the State's strong interest in protecting the public from the substantial risk posed by drunk drivers with the minor inconvenience which may be caused to every fifth motorist and the fleeting, minimal intrusion upon his privacy, the State's action must be considered as a reasonable infringement upon the motorist's expectation of privacy. Nor did the stop become overly intrusive when defendant was asked to produce his license and registration. When the initial detention is lawful as it was here, the police may require the driver to produce his driving credentials." 177 N.J. Super. at 583-84.

In *United States v. Prichard,* 645 F.2d 854 (1981), the Tenth
Circuit Court considered a roadblock operated by two New
Mexico state police officers for the avowed purpose of checking
drivers' licenses and vehicle registration. The roadblock was set
up with the permission of the officers' supervisor. All westbound
vehicles, except semi-trucks, were to be stopped although when
the vehicles began to pile up, the officers waved them on
through and did not resume their checking until traffic had
cleared. This was evidently a discretionary decision made by the
two officers in the field for the purpose of preventing the devel-
opment of a potentially dangerous and time-consuming accumu-
lation of traffic. The court stated:

"In our view, the roadblock stop of the Ford Bronco does not run afoul of the
rule of *Prouse.* While this may not have been a '100% roadblock' of the type
referred to in *Prouse,* it is nonetheless a long way from the selective, single car
stop denounced in *Prouse.* In the instant case, the New Mexico state police were
attempting to stop all westbound traffic on an interstate highway, insofar as was
humanly possible. The decision not to stop trucks was reasonable under the
circumstances, because, presumably, they had all been stopped at a port of entry.
The purpose of the roadblock, *i.e.,* to check drivers' licenses and car registrations,
was a legitimate one. If, in the process of so doing, the officers saw evidence of
other crimes, they had the right to take reasonable investigative steps and were
not required to close their eyes. See *United States v. Merryman,* 630 F.2d 780,
782-85 (10th Cir. 1980). Furthermore, allowing all the stopped cars through when
traffic became congested was also reasonable and, in our view, nonviolative of
the rule of *Prouse.* In sum, the roadblock stop of the Ford Bronco was, under the
described circumstances, constitutional." pp. 856-57.

The border patrol cases, *Prouse* and decisions from other state
and federal appellate courts make it clear that not every driver's
license check or DUI roadblock is constitutionally impermissi-
ble. Certain principles, standards and guidelines may be gleaned
from the various decisions. Stopping an automobile and detain-
ing its occupants constitutes a seizure within the meaning of the
Fourth and Fourteenth Amendments, which prohibit searches
and seizures of an unreasonable nature. *Delaware v. Prouse,* 440
U.S. 648, 653, 59 L.Ed.2d 660, 99 S.Ct. 1391 (1979). The essence
of the Fourth Amendment prohibition is to "safeguard the pri-
vacy and security of individuals against arbitrary invasions by
governmental officials" by imposing a standard of reasonable-
ness upon the exercise of those officials' discretion. *Camara v.
Municipal Court,* 387 U.S. 523, 528, 18 L.Ed.2d 930, 87 S.Ct.
1727 (1967); *Prouse,* 440 U.S.at 653-54. The governing principle

of the amendment is that except in certain carefully defined classes of cases, a search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant. *Camara,* 387 U.S. at 528-29. Whether a warrantless search and seizure falls within these limited exceptions is determined by balancing the degree of legitimate governmental interests against the resulting intrusion of the particular law enforcement practice on individuals' Fourth Amendment rights. *Prouse,* 440 U.S. at 654. However, as *exceptions* to the overriding mandate requiring warrants based on probable cause, these "carefully defined classes of cases" permitting warrantless searches and seizures should be construed narrowly to preserve the integrity of the Fourth Amendment.

In applying the balancing test of the degree of governmental or public interest against the degree of intrusion upon the individual's constitutionally protected rights, the courts have developed a three-factor test or analysis which was stated in *Brown* as:

"a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Brown v. Texas,* 443 U.S. at 50-51.

Numerous conditions and factors must be considered in determining whether a DUI roadblock meets the balancing test in favor of the state. Among the factors which should be considered are: (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test. Not all of the factors need to be favorable to the State but all which are applicable to a given roadblock should be considered. Some, of course, such as unbridled discretion of the officer in the field, would run afoul of *Prouse* regardless of other favorable factors.

When the test enunciated in the cases and the foregoing factors

are taken into consideration and applied to the DUI roadblock in question does it pass constitutional muster? We think it does. The roadblock in question was a joint effort of the highway patrol, Shawnee County sheriff's office and Topeka police department. Thirty-five to forty officers were briefed ahead of time by supervisory personnel of the Topeka police department. The officers were specifically advised to check for driver's license violations and signs of drunk driving. The roadblock was established in a well-lighted area of a four-lane highway. Several police cars were utilized, with a car with its red lights flashing located at each of the four corners of the roadblock. The time of detention was minimal, unless violations were noted, and sufficient officers were present to assure minimum intrusion, timewise. All vehicles going in either direction were stopped and subjected to the license check. The officers in the field had no discretion to pick and choose who would or would not be stopped. The officers were in uniform and readily recognizable as being police officers. The location was selected by supervisory personnel and not the officers in the field.

The Topeka DUI roadblock did not involve the unbridled discretion of the officer in the field which was held oppressive and subject to abuse in *Prouse*. When we consider the enormity of the injury and damage caused by the drinking driver and the vital interest of every citizen in being protected so far as possible upon the streets and roadways, we find that the public interest in a properly conducted DUI roadblock containing appropriate safeguards outweighs the individual's right to be free from unfettered intrusion upon his Fourth Amendment rights. The initial stop of the defendant in this case was under conditions which at least met the minimum requirements for a constitutional momentary seizure and, based upon obvious evidence of DUI, the resultant search and seizure in this case was not unreasonable under the Fourth Amendment or the Kansas Bill of Rights.

Due to the seriousness of any warrantless intrusion into an individual's right to privacy under the Fourth Amendment, we wish to make it clear that the decision herein applies solely to the facts surrounding this particular roadblock. We do not condone blanket, arbitrary exercises of power by governmental authorities which violate Fourth Amendment rights, and any roadblock lacking sufficient standards, guidelines and protec-

tions of the individual's right to privacy would run afoul of constitutional protections guaranteed by the Fourth Amendment and the Kansas Bill of Rights. It might well be advisable that minimum uniform standards for the operation of vehicular roadblocks be adopted and established by the legislature or attorney general, rather than leave the determination thereof to local officials.

Having determined that the initial stop or seizure was not constitutionally invalid, the officer had sufficient reason and probable cause to place defendant under arrest when it appeared he was under the influence of alcohol. The arrest of the defendant being lawful, the search of the passenger compartment of his automobile was also lawful. *State v. White*, 230 Kan. 679, 640 P.2d 1231 (1982).

The trial court erred in its suppression of the evidence and the case is reversed and remanded for further proceedings.

PRAGER, J., dissenting: I respectfully dissent. Today's decision will result in the erosion of one of the basic freedoms contained in the Bill of Rights of both the United States and Kansas Constitutions—the right of every individual to be free from unfettered intrusions on his or her right of privacy by government officials, the right to be left alone. The controversy presented in this case is an extremely difficult one. It cannot be denied there there is a wide difference of opinion on this issue held by reasonable persons of good faith. I have no disagreement with the excellent review of the legal precedents on this issue as contained in the majority opinion by Justice Holmes. However, I disagree with the majority's application of the law to the factual circumstances in the case which is now before us.

The majority opinion declares, without equivocation, that when a police officer accosts an individual and restricts his freedom to depart the scene, he has seized that person. Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment to the United States Constitution, even though the purpose of the stop is limited and the resulting detention is quite brief. The essence of the Fourth Amendment prohibition against unreasonable searches and seizures is to safeguard the privacy and security of individuals against arbitrary invasion by governmental officials

by imposing a standard of reasonableness upon the exercise of those officials' discretion. The majority opinion states that whether a warrantless search and seizure is constitutional is determined by balancing the degree of legitimate governmental interests against the resulting intrusion on the individual's Fourth Amendment rights. In applying the balancing test, the courts must weigh the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

The majority opinion suggests 13 specific factors to be considered in applying the balancing test. The district court considered the evidence in the light of the various factors and concluded that the warrantless search and seizure presented in this case could not be upheld. I agree with the trial court. It is important to emphasize that this is *not* a case involving a driver's license checkpoint. The police officer who testified at the hearing in district court and counsel for the State on this appeal at oral argument conceded that the primary purpose of the roadblock was to catch drunk drivers, although incidental to that purpose arrests were also made for a number of other reasons, including some involving license violations. The trial court found that the roadblock in this case was there to catch drivers under the influence of alcohol (DUI). That same conclusion is accepted by the court on this appeal.

As I see it, the basic issue is this: Does the public interest in a DUI roadblock of the type established in this case outweigh the individual's right to be free from intrusion on his or her right of privacy? The majority opinion correctly states that the burden of proof rests upon the State to prove the validity of the roadblock.

As to the public interest involved, no one can seriously contest the grave concern over the public peril created by drunk drivers. It is safe to say that official efforts to discover and deter drunk drivers are, and should remain, a high priority. Certainly, the need to identify and apprehend drunken drivers is just as clear and pervasive as the need to discover illegal aliens, which was determined to be a sufficient public concern to justify the checkpoint stops in *United States v. Martinez-Fuerte*, 428 U.S. 543, 49 L.Ed.2d 1116, 96 S.Ct. 3074 (1976).

The most pressing question before us is the degree to which

this roadblock checkpoint actually promoted the public interest in deterring drunk drivers. In this regard, we must recognize the fundamental distinction between the offenses of drunk driving, transporting illegal aliens, and failure to carry a valid driver's license. This distinction turns on the way each of these violations is discovered by law enforcement officers. Violations of motor vehicle license laws and the transportation of illegal aliens are in no way physically apparent through mere observation of traffic. The same is not true for DUI violations. It is here that the distinction between the cases arise.

Generally drunk drivers, through their behavior behind the wheel, manifest their presence to even lay observers. They can easily be discerned by law enforcement officers skilled in identifying the signals indicating a driver is operating the vehicle under the influence of alcohol or drugs. In this case, the trial court specifically found that there are alternative less intrusive means available to officers to identify drunk drivers, and police officials need not go to the degree of stopping all traffic at a roadblock. The record in this case shows that the roadblock was in effect for a period of four hours from 10:00 p.m. to 2:00 a.m. The officer testified that during that period, between 2,000 and 3,000 motor vehicles were stopped at the roadblock. A total of 74 violations were discovered at the checkpoint, only 15 of which were for driving while intoxicated. During this period of time 35 police officers were on duty, which for the four-hour period involved a total of 140 man hours. Although it does not specifically appear in the record before us, it was not unreasonable for the trial court to assume that the same or greater productivity in arresting drunk drivers could have been achieved by distributing the 35 officers at various places throughout the city for the sole purpose of observing erratic driving and stopping and checking drunk drivers. In my judgment, the trial court correctly concluded that the State failed in its burden of proof in establishing that the roadblock checkpoint promoted the public interest in light of available less drastic alternative measures which could have been used by the officers to combat the problem, without setting up a roadblock and stopping between 2,000 and 3,000 motorists.

We should not consider the factors suggested in the majority opinion. Factor No. 1 is concerned with the degree of discretion,

if any, left to the officer in the field. It should be considered along with factor No. 4 pertaining to standards set by superior officers for setting up the roadblock or to structure the procedure to be followed by the officers present at the scene. Would a team of three officers, consisting of two patrolmen and a sergeant acting as *supervisor*, have the authority to set up a roadblock anywhere in the city at any time at their discretion? In the present case, the State has not shown the existence of standards or limitations on the discretion of police officers at the roadblock.

Factor Nos. 2 and 3 have to do with the location designated for the roadblock and the time and duration of the roadblock. These factors have in mind the permanency of the location of the checkpoint which is considered as essential in a number of the cases discussed in the majority opinion. In the case before us, the trial court noted that the checkpoint in question had no permanency whatsoever and could have been moved to other locations. Thus it clearly appears that the checkpoint under consideration would not have the essential characteristics of permanency of location required by many of the cases.

Factor No. 6 is concerned with advance warning to the individual approaching motorist. The trial court found, and the record is clear, that advance warning to a motorist approaching the roadblock was practically nonexistent. In his testimony, the police officer admitted that no advance warning, like signs indicating "Danger, roadblock ahead" was present. He testified that no such warning was given because, under the law, a driver's license checkpoint is not required to have an advance warning of any kind. At one point in his testimony, he stated that the only warning to approaching drivers at the scene was the police vehicles with their red lights operating. Four police cars with red lights were parked alongside the road near the curb. This factor of advance warning to approaching motorists is emphasized again and again in the cases. Here there was practically none.

Factor No. 12 is the degree of effectiveness of the checkpoint procedure. As noted above, during the period of four hours in which the roadblock was maintained, 2,000 to 3,000 cars were stopped and only 15 persons arrested for DUI. There was no evidence whatsoever presented by the State that the roadblock procedure had been more effective than the traditional, less intrusive method of detecting drunk drivers. The question again

arises whether or not roadblocks are worth the price of public inconvenience and interference with the individual's right of privacy.

I, likewise, believe that the majority of the court have failed to consider another important factor in this case. In substance, the majority opinion would seem to authorize any police agency in Kansas to set up a roadblock to discover DUI violations. If this is a proper procedure, why should not a police agency be able to maintain a roadblock to discover violators of *other* criminal statutes or city ordinances? Does the majority opinion contemplate that every individual police agency established in the state may, on its own, authorize DUI roadblocks of this type? In Kansas, we have 105 counties and 625 incorporated cities. If each of these political subdivisions decides to maintain a roadblock, we could have "Checkpoint Charley" at the boundary of every city and every county. Motorists could legally be stopped five times or even more often in driving from Wichita to Kansas City. My basic concern is that, without legislative standards and limitations, the rights of Kansas citizens to privacy and freedom from unreasonable intrusion by governmental officials would be destroyed. I cannot in good conscience accept that as a way of life in this land of freedom.

For the reasons set forth above, I would affirm the trial court, and I respectfully dissent.