530 So.2d 1235 (1988)
STATE of Louisiana, Applicant,
v.
Victor CHURCH, Respondent.
No. 19864-KW.
Court of Appeal of Louisiana, Second Circuit.
June 1, 1988.
Writ Granted October 14, 1988.
Burnett, Sutton & Walker by Bobby D. Sutton, Jr., Shreveport, for defendant-respondent.
William J. Guste, Jr., Atty. Gen., Baton Rouge, Paul Carmouche, Dist. Atty., Gary A. Book & Lydia M. Rhodes, Asst. Dist. Attys., Shreveport, for plaintiff-applicant.
Before MARVIN, JASPER E. JONES, FRED W. JONES, Jr., JJ.
JASPER E. JONES, Judge.
The defendant, Victor Church, filed a motion to suppress all evidence of intoxication obtained by the Shreveport City Police pursuant to a DWI roadblock. The trial court granted the motion to suppress. The State was granted a supervisory writ by this court to review the State's contention the trial court erred in finding the roadblock unconstitutional. We find merit *1236 to the State's argument and reverse the judgment of the trial court.

FACTS
On May 30, 1987 the Shreveport City Police Department established a DWI roadblock, also referred to as a sobriety checkpoint, at the intersection of Martin Luther King Drive and North Market Street in Shreveport. The defendant was stopped at the checkpoint at 2:20 a.m. The defendant was stopped solely because he was within the lane of travel proceeding through the checkpoint. Corporal W. E. Smith asked the defendant to produce his driver's license and when he failed to do so, Officer Smith ordered him out of the car. Upon the defendant's exit from the automobile, the officer noticed signs of intoxication. The defendant submitted to a field sobriety test and later to a breath test administered by an officer in charge of an Intoxilyzer-5000 unit resulting in a reading of .13 percent by weight. The defendant was arrested and charged with violations of LSA-R.S. 32:411(D), driving without a license, and LSA-R.S. 14:98, operating a vehicle while intoxicated.
The defendant filed a motion to suppress all evidence obtained by the police pursuant to the roadblock. The defendant argued the exclusionary rule should be invoked because the roadblock utilized to gain the evidence was constitutionally impermissible.
At the hearing on the motion to suppress, the State presented the testimony of law enforcement personnel associated with the planning, organization, and implementation of the roadblock. Police Chief for the City of Shreveport, Charles A. Gruber, testified the initial recommendation to establish DWI roadblocks was made at a management meeting held during December of 1985. The suggestion was prompted by the growing number of alcohol-related accidents.[1] Chief Gruber directed subordinates to develop a written operational procedure wherein the roadblocks would be established at locations where the greatest number of DWI-related accidents and arrests were then occurring. Also a concern expressed by Chief Gruber was that the sites selected be safe for both the citizens and the officers involved. Chief Gruber testified he communicated to the local press that these sobriety checkpoints would be utilized to enforce DWI laws and this information was placed in the local media.
Sergeant Melton of the Shreveport Police Department was in charge of checking statistics and locations for the actual checkpoints. Sergeant Melton compiled a list of the top twenty accident areas in the city. Each location had high incidents of DWI-related accidents or arrests occurring between the hours of 6:00 p.m. and 4:00 a.m. Sgt. Melton limited his research to that time range because those were the hours then patrolled by the DWI task force as these areas exhibited high incidents of drunken driving.
Sergeant Jerry Johnson was in charge of the DWI Task Force, a specialized unit of the Shreveport Police Department assigned to enforcement of the DWI law, at the time the sobriety checkpoints were conceived. Sergeant Johnson was appointed Checkpoint Supervisor and was given the responsibility of drawing up written departmental guidelines for the conduction of the roadblocks. These written guidelines were incorporated in a document referred to as the Operational Checkpoint Procedural Manual.
The operational manual required the presence at each location of one checkpoint supervisor (Sergeant Jerry Johnson), two lead checkpoint officers who initially spoke to each motorist, field sobriety officers, ticket writers, and other personnel. The operational manual recommended a force of 35 personnel at each roadblock, consisting of 19 regular officers and 16 auxiliary officers. There were an average of 25 officers participating in each of the 14 roadblocks conducted. The most present at any one roadblock was 36 officers and *1237 the least present at any one roadblock was 13 officers.
Included in the procedures to be maintained at every checkpoint was a directive to stop every vehicle without exception. No vehicle was allowed to deviate and if the driver of an approaching vehicle attempted to do so a "catch" patrol car prevented the taking of an alternative route.
Flares were positioned along a distance of 500 feet, spaced 100 feet apart. The average number of patrol cars present were 12 per roadblock. The revolving red lights atop the vehicles were kept in operation throughout the duration of the roadblock. This extensive lighting gave the approaching motorist adequate notice of the roadblock and contributed to the safety of the operation.
As each driver was stopped the lead checkpoint officer asked the driver for his driver's license while an auxiliary officer stood to the rear of the vehicle and checked the license plates. If the driver had a valid driver's license, safety inspection sticker, license plates, and showed no signs of intoxication, the car was immediately allowed to pass. For a non-cited motorist, the length of time of contact with the initial officer was 18 to 25 seconds. However, if the lead checkpoint officer determined the driver showed signs of intoxication, the driver was ordered to exit his vehicle and a field sobriety test was administered.
All the roadblocks followed the procedures contained in the operational procedural manual. Sergeant Jerry Johnson lectured the roadblock officers prior to the implementation of each roadblock on the appropriate procedures. In addition each officer was given a field sobriety sheet for reference in the field which briefly reviewed the manner in which to proceed from the time of the initial stop. Sergeant Johnson testified he supervised thirteen out of the fourteen roadblocks conducted and further stated all instructions contained in the operational manual were complied with at every location. The roadblocks were conducted on both Friday and Saturday night starting shortly before midnight and continuing until 2:00 or 3:00 a.m. in the early morning. An average of eight DWI arrests were made at each roadblock which lasted an approximate period of three to four hours. There is evidence in the record that Shreveport's DWI task force, which operates with seven or eight officers on the weekends and five or six during the week, only makes eight arrests in forty hours of patrolling. These statistics reflect the effectiveness of the roadblock wherein eight DWI offenders are arrested and removed from the highway within a three to four hour period.
The effectiveness of the roadblock is even more apparent when it is realized that a DWI suspect stopped at a roadblock would probably never have been stopped by a roving patrol of the DWI task force. The reason for this conclusion is that the roving patrol only stops drivers who have made some observable manuever that indicates to the patrolling officer that the driver may be under the influence of alcohol. The driver arrested at the roadblock had made no suspicious maneuver that brought about his arrest. He was stopped at the roadblock only because he was proceeding in the location of the roadblock at the time the roadblock was in operation. This roadblock driver arrested would have continued down the highway under the influence of alcohol as a continuing menace to the safety of the traveling public had it not been for the roadblock and could have successfully evaded arrest from all DWI task force patrols unless he commenced some maneuver in their presence which disclosed to them his probable intoxication.
Lt. John Brann, a detective with the Shreveport City Police, was also employed by KITT and KEEL radio stations in Shreveport to relate traffic reports during the morning from 6:00 to 8:00 a.m. and in the evening from 4:00 to 5:15 p.m. Lt. Brann testified that during his evening broadcasts he would warn listeners of the likelihood of DWI roadblocks. These announcements would begin as the weekend approached and would be repeated as many as four times during the hour. Although these announcements were not mandated by departmental policy, Lt. Brann testified *1238 they were made "at the pleasure of the police department." Lt. Brann testified the only modification he made to the announcements was prompted by Chief Gruber who requested him to refer to the locations as "sobriety checkpoints" and not DWI roadblocks.
The extensive publicity received by the roadblocks by virtue of the formal announcement of their implementation by the Chief of Police and the frequent announcement made by Lt. Brann deterred those who were consuming alcohol from operating motor vehicles because of the fear of being arrested. These circumstances contributed to the effectiveness of the roadblock as a tool to limit alcohol-related accidents.
The defendant contends the roadblocks are a violation of the Fourth Amendment prohibition against unreasonable searches and seizures and that all evidence obtained in the roadblock stop was inadmissible.

APPLICABLE LAW ON THE CONSTITUTIONALITY OF DWI ROADBLOCKS
The Constitution of the United States forbids all unreasonable searches and seizures. U.S. Const. Amend. IV. The Fourth Amendment provides, "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated ..." The Fourth Amendment is enforceable against the states through the Fourteenth Amendment. Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Louisiana Constitution echoes the mandate of the Fourth Amendment and provides, "every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures or invasions of privacy." LSA-Const. Art. 1, § 5 (1974).
Although the field officer must normally have probable cause to effectuate a reasonable seizure, the jurisprudence has fashioned exceptions to this requirement. Where an officer has an articulable suspicion of misconduct, the individual may constitutionally be detained or "seized." Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This jurisprudential rule has been codified in LSA-C.Cr.P. art. 215.1 which authorizes the warrantless "stop and frisk" of an individual suspected of criminal misconduct.[2] A further exception permits seizures by the governmental authority where the field officer has no articulable suspicion of wrongdoing as evidenced by the supreme court's approval of border checkpoints to reduce the flow of illegal immigrants. United States v. Martinez-Fuerte, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Pursuant to this exception, the test for determining the reasonableness of a seizure made in the absence of any individualized suspicion of wrongdoing has been articulated in the Supreme Court decisions of Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) and Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).
In Delaware v. Prouse, supra, a random stop of a motorist for a driver's license check by a police officer acting without any reasonable suspicion of misconduct was determined to be an unreasonable seizure under the Fourth Amendment. The reasonableness of the seizure as articulated by the Court in Delaware v. Prouse is determined by "balancing [the] intrusion on the individual's Fourth Amendment interests *1239 against its promotion of legitimate governmental interests." Further, the court stated the individual's reasonable expectation of privacy must not be "subject to the discretion of the official in the field." Random automobile inspections conducted without articulable and reasonable suspicion that a motorist is in violation of a traffic regulation are prohibited unless there are previously specified "neutral criteria" which prevent the unfettered exercise of discretion by a police officer in the field. The court indicated questioning of all drivers passing a roadblock stop is one possible alternative to justify the intrusiveness of the detention on the individual.
In Brown v. Texas, supra, the court pointed out that the evaluation of the constitutionality of seizures made without articulable suspicion involves a consideration of the gravity of public concern, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. Above all, such a seizure must be conducted under a plan "embodying explicit, neutral limitations on the conduct of individual officers." Brown v. Texas, supra.
A checkpoint or roadblock stop constitutes a seizure under the Fourth Amendment. United States v. Martinez-Fuerte, supra. Sobriety checkpoints have been held permissible under the federal constitution and several state constitutions.[3] In all cases addressing the constitutionality of the DWI roadblock the intrusion on the individual's expectation of privacy has been weighed against the legitimate governmental interest involved. The governmental interest in establishing DWI roadblocks is the deterrance of injuries and fatalities resulting from drunken driving. Whether or not the governmental interest outweighs the concern for the protection of the individual's reasonable expectation of privacy is determined in part by the severity of the intrusion inflicted by the state in a given set of circumstances. An illustrative list of factors to be considered in making this determination were set forth in State v. Deskins, 673 P.2d 1174 (Kan.1983). In upholding the constitutionality of a DWI roadblock in Deskins, the supreme court of Kansas looked to:
(1) the degree of discretion, if any, left to the officer in the field;
(2) the location designated for the roadblock;
(3) the time and duration of the roadblock;
(4) standards set by superior officers;
(5) advance notice to the public at large;
(6) advance warning to the individual approaching motorist;
(7) maintenance of safety conditions;
(8) degree of fear or anxiety generated by the mode of operation;
(9) average length of time each motorist is detained;
(10) physical factors surrounding the location, type and method of operation;
(11) the availability of less intrusive methods for combating the problem;
(12) the degree of effectiveness of the procedure; and
(13) any other relevant circumstances which might bear upon the test.
The most important factor to be considered is that the procedures utilized curtail the unbridled discretion of the officer in the field. Delaware v. Prouse, supra.
The Louisiana Supreme Court has recently considered the constitutionality of a Baton Rouge roadblock in State v. Parms, 523 So.2d 1293 (La.1988). The court noted that factors which have been considered essential in those cases which have found the roadblock constitutional were not present in the Parms case.
In State v. Parms, supra, the supreme court noted no written policy governed the officers in the field, there was no evidence that the location was particularly noted for drunken driving, and no evidence of advance publicity. The officers had "complete discretion" as to which vehicles would *1240 be stopped as other vehicles were allowed through without detention by the officers. The length of each detention "was at the unfettered discretion of each officer" in violation of the precepts of Delaware v. Prouse and Brown v. Texas. The supreme court concluded the roadblock was unconstitutional, stating because the field officers had unbridled discretion, the requirements of the Fourth Amendment were not met.
A review of this record reveals those circumstances which mandated the determination of the unconstitutionality of the DWI roadblock in State v. Parms do not exist in the instant case. A coherent plan in writing for the implementation of the roadblocks was created and approved by supervising officers well in advance of the execution of the roadblocks. Chief Gruber gave advance notice to the media that roadblocks would be utilized to enforce DWI laws. This publicity was maintained for several months after the first roadblock through radio reports to the public made by an employee of the police department. Those locations chosen to be roadblock sites were areas high in alcohol-related accidents and arrests. The logistical decisions were made pursuant to careful review of statistics showing several areas warranting the enforcement of DWI laws. The departmental guidelines were reduced to writing in the form of a manual, a copy of which was given to the officers running each roadblock. These procedural guidelines dictated that all vehicles be stopped. No motorists were allowed to pass through. There was no opportunity given for a random or arbitrary selection of drivers by the lead checkpoint officers. Safe sites were carefully chosen for each roadblock and their safety was enhanced by the extensive use of flares and red lights on the top of numerous patrol cars for lighting the roadblock. Only one of the 7,559 vehicles that were stopped at roadblocks was involved in an accident and the driver of that vehicle was later charged with his second DWI offense arising from the accident. Each location was more than adequately manned by law enforcement personnel, each with carefully delineated responsibilities which insured that all officers were not occupied at any given time, thereby allowing each motorist to be detained for a minimal amount of time. Above all, these roadblocks were executed by field officers who had almost no discretion in the decision-making process other than to act according to the written guidelines drafted by supervisory personnel.
The Parms case did not approve specific guidelines for a constitutional roadblock in Louisiana. However, the opinion discussed at length with apparent approval the guidelines applied in other cases in other jurisdictions which were found to support constitutional roadblocks. The roadblocks conducted by the City of Shreveport, including the one wherein Church was arrested, met the very best criteria found in all the constitutional roadblocks discussed in the Parms decision. We find the rationale of the Parms decision to fully support the conclusion that the roadblock here under consideration did not violate the Fourth Amendment of the U.S. Constitution.
The court in Parms noted our Louisiana Constitution provides greater protection for individual rights than that provided by the Fourth Amendment.[4] However, our supreme court did not discount the possibility DWI roadblocks can pass state constitutional review where the state interest involved proves sufficiently compelling. The scope of our state constitution does not preclude any form of governmental interference nor does it mandate that governmental interests can never supercede individual *1241 rights. The ever increasing number of alcohol-related accidents causing large numbers of serious injuries and deaths magnifies governmental interest in deterring DWI.[5] The governmental interest is great and the exercise of that interest through DWI roadblocks pursuant to carefully designed guidelines which afford a minimum interference with individual rights must be deemed permissible under our Louisiana Constitution. See Footnote # 1, supra.
We find the state interest in deterring drunken driving and alcohol-related accidents at the particular location where Church was arrested to be valid and supported by the record. We further conclude that, weighing this valid governmental interest against Church's right to privacy, the procedures used were reasonable and afforded minimal intrusion upon the rights of Church. Accordingly we find the seizure of Church pursuant to the roadblock to be constitutionally permissible under the State and U.S. Constitution and the evidence obtained from the roadblock stop is admissible in the trial court. We therefore reverse the trial court's judgment sustaining the defendant's motion to suppress.

DECREE
For the reasons expressed above, the writ granted is made peremptory and the decision of the trial court granting defendant's motion to suppress is reversed and the case is remanded to the trial court for further proceeding according to law.
REVERSED.
FRED W. JONES, Jr., J., concurs and assigns written reasons.
FRED W. JONES, Jr., Judge, concurring:
As indicated by Justice White in Delaware v. Prouse, the stopping of an automobile by the police is a seizure within the context of the 4th Amendment. Both that amendment and Article 1, Section 5 of the Louisiana Constitution prohibit unreason able seizures. The latter also forbids unreasonable invasions of privacy.
As pointed out by Hargrave in his Comment, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La. L.R. 1, 20, this state constitutional provision dealing with invasion of privacy is an expansion of the traditional guarantee against unreasonable searches and seizures. It established an affirmative right to privacy which will have an impact on non-criminal as well as criminal areas of law. Further, the phrase "can be traced to fear of unrestrained gathering and dissemination of information on individuals through use of computer data banks."
Since the individual is already protected against unreasonable seizures, as to this case the protection against unreasonable invasions of privacy seems to add no further additional barrier and does not, in itself, automatically preclude the state's use of sobriety checkpoints.
As pointed out, the question here involves a balancing test: the weighing of the public interest served against the privacy right interfered with by the practice. I concur primarily to elaborate upon the public interest involved in the apprehension of drunk drivers. It is noted in Delaware, supra, that the apprehension of drunk drivers is a state interest subsumed in the general interest in roadway safety.
The dimension of this problem is highlighted in a Comment, The Prouse Dicta: From Random Stops to Sobriety Checkpoints?, 20 Idaho L.R. 127 (1984), as follows:
"Every day the vast majority of Americans use our automobiles. While this relatively economical means of transportation has allowed us to become the most mobile society in history, it has also subjected countless families to immense and often unnecessary tragedy. It has been estimated that the slaughter on our highways exceeds the death toll of all our wars. The peril is not simply the automobile itself, but rather our unwillingness *1242 or inability to keep the intoxicated driver off the road.
A staggering 2.1 million Americans were killed in alcohol related accidents prior to 1975 and in 1980 alone over 650,000 people were injured in accidents involving alcohol. No jurisdiction is immune from this carnage.
"The state's interest is undoubtedly the strongest argument in favor of sobriety checkpoints. Statistics show that over the past 10 years the number of persons killed on our highways in motor vehicle accidents involving alcohol has averaged 25,000 per year. Between 40% and 55% of drivers who are fatally injured have alcohol concentrations in their blood over the legal limit. It has been estimated that one out of every 50 drivers on the road has a blood-alcohol content of .10 or higher and that on Friday and Saturday nights, one out of every 10 drivers is drunk."
The question of the constitutionality of sobriety checkpoints is addressed in a Comment, Curbing the Drunk Driver under the Fourth Amendment: The Constitutionality of Roadblock Seizures, 71 Georgetown Law Journal 1457 (1983), as follows:
"In general, the state interest in keeping drunk drivers off the road seems sufficient to justify the use of minimally intrusive roadblock operations. DWI roadblocks are a necessary component of a systematic plan of drunk-driving deterrence. Without the use of DWI roadblocks the police could not detect many drunk drivers because not all of these drivers exhibit signs of intoxication. In addition, DWI roadblocks increase the perceived risk of drunk-driving detections and thus deter motorists from attempting to drive while intoxicated." (p. 1471).
In view of the dimension of the problem of drunk driving and the strong public interest involved in apprehending drunk drivers, it does not appear that the minimal intrusion represented by this particular sobriety checkpoint violated either the federal or the state constitution.
NOTES
[1] Statistics contained in the record reflect in 1985 thirty-five percent (35%) of the accidents resulting in a fatality were alcohol-related and in 1986 thirty-eight percent (38%) of the accidents resulting in a fatality were alcohol-related. The first roadblock conducted by the Shreveport Police Department was implemented in December of 1986.
[2] LSA-C.Cr.P. art. 215.1 provides:

Art. 215.1 Temporary questioning of persons in public places; frisk and search for weapons
A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.
[3] See State v. Garcia, 500 N.E.2d 158 (Ind.1986), cert. den. ___ U.S. ___, 107 S.Ct. 1889, 95 L.Ed.2d 496; Nelson v. Lane County, 304 Or. 97, 743 P.2d 692 (1987); Ingersoll v. Palmer, 241 Cal.Rptr. 42, 743 P.2d 1299 (1987); Little v. State, 300 Md. 485, 479 A.2d 903 (1984); State v. Deskins, 234 Kan. 529, 673 P.2d 1174 (1983).
[4] The Louisiana Constitution protects against not only unreasonable searches and seizures but also against any unreasonable invasion of privacy. LSA-Const. Art. 1, § 5 (1974). Our state constitution has therefore been interpreted as broader in scope in the area of governmental infringement upon individual rights. Our supreme court has stated: "This constitutional declaration of right is not a duplicate of the Fourth Amendment or merely coextensive with it; it is one of the most conspicuous instances in which our citizens have chosen a higher standard of individual liberty than that afforded by the jurisprudence interpreting the federal constitution." State v. Hernandez, 410 So.2d 1381 (La. 1982).
[5] There is evidence in the record that the alcohol-related serious accidents decreased by over 100 during the nine month time frame that the roadblocks were being utilized.