523 So.2d 1293 (1988)
STATE of Louisiana
v.
Felix PARMS.
No. 87-KK-2508.
Supreme Court of Louisiana.
April 11, 1988.
Concurring Opinion April 18, 1988.
Rehearing Denied June 1, 1988.
*1294 Kevin Monahan, Robert Felton Monahan, Vinet & Monahan, Baton Rouge, for applicant.
William J. Guste, Jr., Atty. Gen., Houston Gascon, III, Dist. Atty., E. Neil Harmon, Asst. Dist. Atty., for respondent.
WATSON, Justice.
At issue is the constitutionality of a police roadblock stop and seizure. Defendant, Felix Parms, filed a motion to suppress the evidence of intoxication obtained when his automobile was stopped May 3, 1986, at 2:43 A.M. on Louisiana Highway One South. The trial court denied the motion and the court of appeal denied a writ. This court granted certiorari and remanded to the court of appeal for an opinion.[1] A writ has been granted[2] to consider the judgment of the court of appeal, which affirmed the trial court.[3]

FACTS
At the hearing on the motion to suppress, the state produced two witnesses in its effort to prove the constitutionality of the seizure at this roadblock, Trooper Michael G. Harrell and Sergeant Robert A. Harrison of the Louisiana State Police.
Trooper Harrell described this as a DWI checkpoint manned by seven officers from the West Baton Rouge Parish Sheriff's office and the Louisiana State Police. In addition to sobriety, the officers were checking drivers' licenses, proof of insurance, and inspection stickers. The roadblock had been set up about 12:30 A.M. and closed about 3:30 A.M.
Trooper Harrell did not know whether there was any advance warning to the public that a sobriety checkpoint was going to be established and did not know if Highway One had been studied in connection with frequency of drunken driving. According to his recollection, a study of areas *1295 with high accident rates had not targeted this section of Highway One.
Harrell had been advised by radio to report to the location and stop every car, but, when the officers were busy, some motorists were allowed to proceed. The length of detention for each car was up to the individual officer's discretion. There was no record of the number of vehicles that passed the roadblock, but nine or ten arrests were made. Harrell's instructions were to investigate any odor of alcohol, but he did not have a policy or manual to guide his conduct at the checkpoint.
Sergeant Robert A. Harrison of the Louisiana State Police stated that he was operating a police department van with equipment for testing intoxication. Although he was in charge of the roadblock, he did not arrive until after 2:00 A.M. Initially, Harrison said the main purpose of the roadblock was a drivers' license check, but it turned out to be more productive than anticipated with DWI's. Subsequently, he admitted that the real purpose of the roadblock was a sobriety check. The area was well lighted and had ample room for cars to be waived to the shoulder. According to Sergeant Harrison, his supervisors initiated the activity to keep the troopers busy and there was no prior warning to the citizens. There were no instructions or policy for conducting the checkpoint. The individual officers had discretion to wave cars on if they were busy. Drivers' license roadblocks are periodically located throughout the parishes, but this roadblock required a little more care as to lighting and space. Sergeant Harrison had participated in only one DWI roadblock like this.
Trooper Harrell stopped Felix Parms' automobile and asked for his driver's license. Parms' driving had not appeared impaired or erratic. Detecting the odor of alcohol, Trooper Harrell directed Parms' automobile to the shoulder of the road and asked Parms to step to the rear of the automobile so that Harrell could determine if the odor came from Parms or the other people in the car. Parms emitted a strong odor of alcohol; his eyes were bloodshot; his speech slurred; and his stance unsteady. After Miranda warnings and a field sobriety test, Trooper Harrell determined that Parms was highly intoxicated and placed him under arrest for driving while intoxicated. Harrell then took Parms to the intoximeter van and advised him of his rights. Parms consented to the test[4] and registered .22.

LAW
The Fourth Amendment to the Constitution of the United States prohibits unreasonable searches and seizures.[5] The Louisiana Constitution protects against unreasonable searches, seizures and invasions of privacy.[6]
Under Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), seizures are reasonable only if there are neutral limitations on the discretion of the field officers. Other factors to be weighed are: (1) the gravity of the problem; (2) the degree to which the seizure serves the public concern; and (3) the extent of the interference with individual liberty.

Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) held *1296 that random spot checks of motorists without articulable and reasonable suspicion of unlawful activity were unreasonable seizures under the Fourth Amendment. Because an individual's expectation of privacy is not abandoned upon entrance into an automobile, a motorist's freedom cannot be interferred with even for a limited time at the unbridled discretion of police officers. Absent an articulable basis for reasonable suspicion of criminal activity, Prouse prohibits regulatory automobile inspections unless there are previously established "neutral criteria"[7] which prevent the unconstrained exercise of discretion by field officers. In dicta Prouse says that: "Questioning of all oncoming traffic at roadblock-type stops is one possible alternative" [to random stops].[8]
Many other states have considered the constitutionality of roadblocks. Oregon[9] and New Hampshire[10] have held sobriety roadblocks unconstitutional under their state constitutions. The state constitutions of Texas,[11] Pennsylvania[12] and California[13] do not allow combination dragnet stops.
Nelson v. Lane County, 304 Or. 97, 743 P.2d 692 (1987) decided that a sobriety roadblock conducted under the direction of a supervisory officer, which stopped all drivers except when traffic became congested, informed motorists of the checkpoint's purpose, and asked for drivers' licenses and vehicle registrations was reasonable under the Fourth Amendment. Therefore, plaintiff could not receive punitive damages under the federal civil rights act for her detention. However, under the Oregon Constitution, the stop and seizure were unlawful because they were used to gather evidence of criminal activity without prior individualized suspicion of wrongdoing. The matter was remanded for plaintiff to develop her claim for damages under other theories. Thus, the roadblock was found to pass federal constitutional muster but failed under the stricter standard applied in Oregon.
State v. Boyanovsky, 304 Or. 131, 743 P.2d 711 (1987) held that defendant's detention and the search of his person and documents at a sobriety checkpoint were unconstitutional, because the Oregon constitution bars criminal sanctions when there is a search or seizure without prior individualized suspicion of criminal activity. Also see State v. Anderson, 304 Or. 139, 743 P.2d 715 (1987).
State v. Koppel, 127 N.H. 286, 499 A.2d 977 (1985) was based on the New Hampshire Constitution which, like Oregon, has language similar to the federal constitution but has been held to provide greater protection for individual rights than the Fourth Amendment. In Koppel, 47 sobriety roadblocks were set up and 1,680 vehicles were stopped, but only 18 DWI arrests were made. During the same six months, 175 DWI arrests were made by the traditional use of roving patrols. In Koppel, every car was stopped until five cars had been detained at which time other traffic was allowed to pass until one of the five left the roadblock.
Delaware v. Prouse, supra, was distinguished in Koppel as involving a regulatory check not aimed at discovering evidence of serious criminal offenses. In view of the small percentage of drunk drivers arrested, the Koppel court concluded that roadblocks are not any more effective in detecting drunk drivers than less intrusive methods. The utility of these roadblocks as a deterrent to drunken driving was lessened by the lack of advance publicity. Noting the danger of police state procedures *1297 which generate concern and fright on the part of lawful travelers, the Koppel court concluded that the state failed to prove that DWI roadblocks produce sufficient public benefit to outweigh their intrusion on individual rights.[14]
After Koppel, the New Hampshire legislature provided for judicial authorization of sobriety checkpoints on the basis of objective criteria with general notice to the public but no disclosure of specific locations. This legislation was found to pass constitutional muster. Opinion of the Justices, 128 N.H. 14, 509 A.2d 744 (1986).[15]
In Webb v. State, 739 S.W.2d 802 (Tex. Cr.App.1987) there was no evidence that the officers manning the roadblock were acting according to neutral criteria. The court concluded that a combination stop violates the Fourth Amendment and the Texas Constitution. In dicta, Webb said a roadblock established solely for determining sobriety might be constitutionally permissible. However, this roadblock lacked operational guidelines and safeguards to protect motorists from unreasonable seizures and was a subterfuge for a general investigatory sweep of motorists in the area. It was aimed at any and all illegal activity.
Com. v. Tarbert, 348 Pa.Super 306, 502 A.2d 221 (1985) held that under the Pennsylvania Constitution:
"[P]olice roadblocks, which, without probable cause or a reasonable suspicion that a crime has been or is being committed, stop all vehicles travelling on a public highway for the purposes of checking licenses, registrations, inspection violations, and for drivers operating vehicles under the influence of alcohol are so violative of our citizen's rights that they must be declared unconstitutional."[16]
Com. v. Leninsky, 360 Pa.Super 49, 519 A.2d 984 (1986) decided in a plurality opinion that the public interest in highway safety, in particular, the vital need to detect and remove drunken drivers from the highways, was outweighed by the degree of discretion vested in the field officers. The officers were permitted to chose the time, date, and location of the checkpoint without written guidelines or procedures. Moreover, adequate instructions regarding the operation were not given by supervisory personnel. Because the stop involved unbridled discretion, it was constitutionally infirm and the evidence was suppressed. The two concurring judges stated that Tarbert controlled.
Ingersoll v. Palmer, 241 Cal.Rptr. 42, 743 P.2d 1299 (1987) concluded that sobriety checkpoints are permissible under the federal and California Constitutions when operated within certain limitations. The Ingersoll roadblocks were established according to a detailed manual. The locations were selected by considering the frequency of drunk driving arrests, accidents and safety factors. Warning signs were posted prior to the checkpoints and every fifth car was stopped. All the officers on duty had been trained in checkpoint procedures and were experienced in DWI detection. There was advance publicity about the sobriety checkpoints, constitutionally important because it reduces the intrusiveness of the stop and increases the deterrent effect. Under the California policy manual, the purpose of the checkpoints was not to make more DWI arrests, but to deter drinkers from driving. Characterized as administrative and analogized to those at airports, these checkpoints were found permissible under the dicta in Delaware v. Prouse, supra. The fact that one checkpoint produced no arrests was justified by its deterrent effect and the drivers' ability to turn away before reaching the checkpoint. Since the primary purpose of the checkpoints was not discovering evidence of crime and arresting drunk drivers but *1298 deterring intoxicated people from driving, the roadblocks were held to be a reasonable invasion of individual rights.
In dicta, Ingersoll stated that dragnet searches are unreasonable and noted that a sobriety checkpoint is improper at a location without any significant incidence of drunk driving.
A strong dissent in Ingersoll said that calling a sobriety checkpoint an administrative inspection ignores its true purpose which is to apprehend drunk drivers. Since roadblocks do not produce nearly as many arrests per officer hour as patrols in which drivers are stopped for cause, the dissent questioned their effectiveness.
Little v. State, 300 Md. 485, 479 A.2d 903 (1984) noted that a majority of courts have sustained the use of roadblocks as a proper law enforcement tool citing several post-Prouse cases: State v. Deskins, 234 Kan. 529, 673 P.2d 1174 (1983), discussed infra; United States v. Prichard, 645 F.2d 854 (10 Cir.1981), cert. den. 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981);[17]United States v. Miller, 608 F.2d 1089 (5 Cir.1979), cert. den. 447 U.S. 926, 100 S.Ct. 3020, 65 L.Ed.2d 1119 (1980);[18]United States v. Obregon, 573 F.Supp. 876 (D.N.M.1983);[19]State v. Roberson, 165 Ga.App. 727, 302 S.E.2d 591 (1983);[20]People v. Meitz, 95 Ill.App.3d 1033, 51 Ill.Dec. 561, 420 N.E.2d 1119 (1981);[21]Miller v. State, 373 So.2d 1004 (Miss.1979);[22]People v. John BB., 56 N.Y.2d 482, 438 N.E.2d 864, 453 N.Y.S.2d 158 (1982);[23]State v. Halverson, 277 N.W. 2d 723 (S.D.1979).[24]
According to Little, roadblocks are constitutional when: (1) the discretion of field officers is carefully limited by objective regulations established by high level administrative officials;[25] (2) approaching drivers are given adequate warning that there is a roadblock ahead; (3) fear and surprise are reduced by a display of police authority; and (4) vehicles are stopped on a systematic non-random basis that shows drivers they are not being singled out for an arbitrary reason.
Little found a compelling state interest in controlling drunken driving, because fifty-five percent of all traffic fatalities are alcohol related and quoted South Dakota v. Neville, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983) which found "`the slaughter on the highways of this Nation [caused by drunkenness] exceeds the death toll of all our wars'".[26]
Because a sobriety checkpoint program had resulted in a seventeen percent decrease *1299 in alcohol related accidents in one county with evidence indicating that many drunken drivers found alternate means of transportation, Little held that the intrusion was outweighed by the state's interest in preventing drunken driving. Concluding that sobriety checkpoints have a substantial impact on drunken driving, the Little court decided that the mechanism is sufficiently productive to justify the minimal intrusion on individual liberty.[27]
State v. Deskins, supra, involved a drivers' license checkpoint which was a facade for a sobriety roadblock. The factors enumerated in Deskins for determining whether a DWI or DUI roadblock meets the balancing test in favor of the state are: (1) the degree of discretion left to field officers; (2) the location of the roadblock; (3) the time and duration; (4) standards set by superior officers; (5) advance notice to the public; (6) advance warning to approaching motorists; (7) safety conditions; (8) degree of fear or anxiety generated; (9) average length of detention; (10) physical factors surrounding the location and method of operation; (11) the availability of less intrusive methods for combating the problem; (12) the effectiveness of the procedure; and (13) any other relevant circumstances. While all these factors need not favor the state, Deskins said the one indispensable condition for a constitutional roadblock is control over the discretion exercised by field officers.[28] Unbridled discretion by field officers runs afoul of Prouse regardless of other favorable factors.[29] The Deskins roadblock was found to pass constitutional muster because the officers were briefed ahead of time by supervisory personnel; the area was well lighted; the time of detention was minimal; all vehicles were stopped; the officers in the field had no discretion to chose who would be stopped; and, the location was selected by supervisory personnel.[30]
In Com. v. Trumble, 396 Mass. 81, 483 N.E.2d 1102 (1985), the court considered a roadblock which had been set up under written state guidelines preceded by training sessions and a demonstration. The thirteen state troopers were instructed to adhere to the guidelines and stop all cars. Extensive media publicity had been disseminated about up-coming roadblocks prior to the July 4th weekend. Criteria to be applied in selecting a roadblock site were: high accident rates; large numbers of drunk driving arrests; safety conditions; and motorists' convenience. The troopers informed each driver that it was a sobriety checkpoint and gave each a drunk driving brochure. If there were no problems, the stopping time was approximately thirty seconds. All of the 503 vehicles which approached the roadblock were stopped: sixteen drivers were detained for further checks and eight drivers were arrested. Recognizing a strong public interest in reducing drunken driving, the court upheld the Trumble procedure. The conduct of the roadblock was found to be a constitutional effort to deter drunken driving because: vehicles were not selected and stopping time was limited; there was advance planning by supervisory personnel coupled with advertisement in the news media; and no discretion was exercised by the officers at the scene.[31]
*1300 State v. Super. Ct. in & for County of Pima, 143 Ariz. 45, 691 P.2d 1073 (1983) involved sobriety checkpoints by the Tuscon police department during the month of December, which were operated according to an extensive command directive. The stop points were proceeded by several signs and no citations were issued for traffic violations, although the drivers were warned of any deficiencies. The personnel at the roadblock had written directives covering their speech and actions.[32] There were announcements to the public one to three days in advance of each roadblock and there was testimony that the number of alcohol related automobile accidents dropped significantly as a result of the roadblocks and the attendant publicity. Because of the gravity of the drunken driving problem, the compelling need for state action, and the minimal intrusion of the stops, which lasted only five to twenty seconds, the roadblocks were found to be constitutional.[33]
State v. Garcia, 500 N.E.2d 158 (Ind. 1986), cert. den. ___ U.S. ___, 107 S.Ct. 1889, 95 L.Ed.2d 496 involved a DWI roadblock in which officers stopped traffic in groups of five. Seven percent of the 100 drivers stopped were intoxicated. In view of the deaths attributable to drunken drivers, said to average 25,000 per year, society's interest in detecting drunken drivers was found to outweigh the low level of interference.
In Garcia, strong dissents noted that the procedure used was essentially random because five cars were pulled over at a time and others were waived on until each five had been dealt with, distinguishing this roadblock from those which stop all traffic or make a specified selection such as every tenth, twenty-fifth or fiftieth car. Which group of five cars was to be stopped became a matter of luck.
Although Garcia had a questionable selection procedure, the plan to conduct roadblocks had been publicized; the location in question had been picked based on police records of numerous alcohol related accidents at the site; the detention time was brief; motorists had so much advance warning that many turned around and escaped the stop; the officers followed a uniform procedure; and there was a known percentage of arrests.
People v. Scott, 63 N.Y.2d 518, 473 N.E.2d 1, 483 N.Y.S.2d 649 (1984) upheld a sobriety roadblock even though some cars were allowed to pass when traffic became congested. This was held insufficient to make a pattern of selective discrimination under United States v. Prichard, supra, and People v. Lust, 119 Ill.App.3d 509, 75 Ill.Dec. 159, 456 N.E.2d 980 (1983).[34]
State v. Martin, 145 Vt. 562, 496 A.2d 442 (1985) found no constitutional infirmity in a sobriety roadblock where the vehicles were stopped on a systematic nonrandom basis and the discretion of the officers in the field was carefully circumscribed by objective guidelines. While the written guidelines in Martin were below the standards in State v. Hilleshiem, 291 N.W.2d 314 (Iowa 1980)[35] and Little, supra, they *1301 were found to be constitutionally adequate. The matter was remanded to the trial court for the trial court for consideration of the validity of the roadblock under six criteria: (1) the initial stop must involve an explanation of the nature of the roadblock and minimal detention; (2) the officers in the field must be controlled by objective guidelines established at a high administrative level; (3) the guidelines must be followed; (4) approaching drivers must be given adequate warning; (5) fear or apprehension must be dispelled by a visible display of legitimate police authority; and (6) vehicles must be stopped on a systematic non-random basis.
Com. v. McGeoghegan, 389 Mass. 137, 449 N.E.2d 349 (1983) involved a drunken driver roadblock: the area was poorly illuminated and unsafe for motorists; the mechanics of the roadblock were left to the discretion of the field officers; the officers used their own judgment in deciding which cars to stop; and the motorists were backed up on the highway for at least two-thirds of a mile. The procedure was not conducted according to a plan devised by supervisory personnel and there was no advance publicity. McGeoghegan held that the roadblock seizures were not reasonable.
In State v. Crom, 222 Neb. 273, 383 N.W.2d 461 (1986), checkpoints were set up by field officers without any standards, guidelines, or procedures. Every fourth vehicle was stopped. Since a police department unit was left free to decide when, where, and how to establish a transitory checkpoint, it was constitutionally infirm because the drivers' reasonable expectation of privacy was invaded at the unfettered discretion of field officers.
Com. v. Amaral, 398 Mass. 98, 495 N.E. 2d 276 (1986) decided that a roadblock similar to the one under scrutiny was unconstitutional, because there was no evidence that guidelines were established or followed. Amaral held that the time, location, and procedures to be followed at roadblocks must be determined under neutral criteria established by administrative officers. Advance publicity, although not indispensable, increases the deterrent effect. Another factor that tends to eliminate arbitrariness is the selection of a roadblock site because it has been a problem area where accidents or prior arrests for drunken driving have occurred. In Amaral, defendant's motion to suppress was sustained because the state did not prove that the stop and search were constitutionally reasonable.

CONCLUSION: FOURTH AMENDMENT
It is undisputed that the state and the public have a vital interest in deterring and detecting drunken driving. This interest must be balanced against the constitutional freedoms guaranteed to individuals. Generally, absent probable cause or reasonable suspicion of criminal activity, citizens should be free from police interference and harassment. Under the Fourth Amendment to the United States Constitution as interpreted by the United States Supreme Court, state roadblock interference with automobile drivers is allowed when the procedure is based on neutral criteria and effective enough in serving a compelling state interest to justify a minimal intrusion.[36]
*1302 The court of appeal erred in its analysis of the Fourth Amendment question. The dissenting judge in the court of appeal correctly stated:
"[T]he record does not include any evidence to establish that the roadblock was conducted pursuant to written department guidelines or specific oral departmental policies, although these may have existed. However, there is also no evidence of advance planning; there is no evidence of either training sessions conducted by the police or sheriff's department or a meeting of the officers to discuss implementation of the roadblock. In fact, the supervisor of the roadblock testified that the roadblock was organized that evening so that the troopers would have some type of activity to keep them busy. Furthermore, there is no evidence to establish that the detention techniques of the officers were standardized. In short, the record does not establish that the roadblock was executed pursuant to specific neutral criteria designed to limit the conduct of the individual officers. Uniform guidelines for the implementation of this type of roadblock are necessary to insure against abuse and to restrict the potential intrusion into the public's constitutional liberties.
* * * * * *
"Another factor to be examined is the degree of the effectiveness of the procedure. Although the site of the roadblock has been utilized for roadblocks in the past and may have yielded some deterrent effect, there is no evidence in the record to indicate that the site of the roadblock was chosen based on traffic studies which would indicate that a high volume of DWI arrest occur in this area. The record does not give a ratio of number of stops to number of arrests, so it is difficult to evaluate the effectiveness of the roadblock procedure. Less intrusive means, such as a stop based on reasonable suspicion, may prove to be as effective as some roadblock procedures."[37]
Here, in contrast to Little, supra, there is no empirical data in the record to establish that the roadblock's effectiveness in deterring or detecting drunken driving made its intrusion upon individual rights constitutionally reasonable.
These officers had complete discretion as to their detention of each car. This discretion allowed other cars to pass on a random basis. The only instruction Harrell had received was to report and stop every car, but he did not do this. There was no evidence that the location was a fertile field for drunken driving. There was no written policy governing the officers at the roadblock, and the officer in charge did not arrive until midway in the procedure. The officers were not instructed about their approach to the drivers and had a haphazard policy in selecting the cars to be stopped. The discretion of the officers in the field was not governed by neutral criteria and the cars were not stopped in a systematic way, violating the precepts and dicta in Delaware v. Prouse, supra. Brown requires neutral limitations on the field officers' discretion. There is no evidence of such limitations.
None of the elements relied on by the Garcia majority are in this record. There is no evidence of publicity; basis for site selection; brief time of detention; advance warning; uniform procedures; or the percentage of arrests. Even the selection in Garcia was less random than this one where cars were waved on at the discretion of each individual officer.
Although the problem of drunken driving is a grave one, the absence of any statistics on the number of motorists stopped prevents *1303 a determination of this roadblock's effectiveness. The interference with the individual motorist's liberty apparently varied at the whim of the officer involved, since the length of detention was at the unfettered discretion of each officer.
There was no advance publicity that roadblocks might be established, which would act as a deterrent to drunken driving. There was no evidence that a roadblock operation is more effective than stops made when there is individualized suspicion of criminal conduct. This roadblock does not meet the requirements of the Fourth Amendment because the field officers had unbridled discretion.

CONCLUSION: LOUISIANA CONSTITUTION
Louisiana, like Oregon and New Hampshire, provides greater state constitutional protection for individual rights than that provided by the Fourth Amendment.[38] The court of appeal failed to consider the constitutionality of this seizure under the Louisiana Constitution. The expanded protection of individual freedom read into the Oregon and New Hampshire Constitutions is explicit in the Louisiana Constitution, which protects against not only searches and seizures but unreasonable invasions of privacy. "The traditional guarantee against unreasonable searches and seizures is cemented and expanded by the section."[39]
Since Louisiana places a higher emphasis on individual freedom than that found in the federal constitution, the state must avoid the evils of police state measures. Roadblocks certainly smack of police state measures,[40] and it is doubtful if they could ever pass muster under the Louisiana Constitution.[41] When analyzed as seizures without probable cause or reasonable suspicion and invasions of privacy, they are unconstitutional under the Louisiana Constitution of 1974.
An argument can be made that the danger of drunken driving is so great that a reduction in liberty and freedom can be justified. The same argument could be made concerning cocaine, marijuana, "T's and Blues", firearms possessed by felons, and other illegal substances or instrumentalities for criminal activities. Even if the constitutional considerations could be overcome by establishment of neutral criteria, guidelines, and other window-dressing, an additional factor militates against roadblocks: the cases reviewed indicate that roving patrols making stops of erratic drivers are more effective against drunken driving.
Here, there was no evidence of a compelling state interest justifying this roadblock; no evidence that it was governed by neutral criteria; no evidence that the discretion of the field officers was limited; and no evidence that those stopped were advised of the reason for their detention.[42]
For the foregoing reasons, the judgment of the Court of Appeal is reversed and the motion to suppress filed by Felix Parms is granted.
REVERSED AND RENDERED.
LEMMON, J., concurs and assigns reasons.
COLE, J., concurs. The roadblock as conducted in this case, was an unreasonable invasion of privacy.
DENNIS, J., will assign additional reasons.
CALOGERO, J., additionally joins in the concurring reasons assigned by DENNIS, J.
MARCUS, J., dissents and assigns reasons.
*1304 LEMMON, Justice, concurring in the decree only.
My purpose in writing separately is to disclaim the extensive unnecessary language in the opinion of the court and to emphasize the narrowness of the holding in this case, which is that the record does not support a conclusion that this particular DWI roadblock was constitutionally permissible. I particularly disclaim (1) the unnecessary suggestion that the Louisiana Constitution may prohibit DWI roadblocks under any circumstances (this is, even those conducted pursuant to the types of administrative regulations approved by many other courts), and (2) the possible impression, from the discussion of numerous factors that may improve the procedure for conducting DWI roadblocks, that the constitutionality of a particular roadblock should be determined by standards other than the constitutional lynchpin of reasonableness.
The federal and state constitutions prohibit only those searches and seizures which are unreasonable. The determination of the reasonableness of a roadblock-type seizure (one in which motorists are not singled out for seizure based on "individualized suspicion") involves weighing the legitimate state interest in deterring drunk driving against the legitimate constitutional interest in protecting citizens from excessive governmental intrusion. Whether better procedures could have been used is not the critical issue.
Requiring the driver of an automobile to stop his vehicle, even momentarily, is a seizure within the contemplation of the Fourth Amendment.[1] Thus, the balancing of the competing factors must weigh in favor of a conclusion that the seizure was reasonable in order for the procedure to be constitutional, or the police action otherwise runs afoul of the federal and state constitutional proscriptions against unreasonable seizures. However, I believe that a stop pursuant to a properly conducted DWI roadblock can be a reasonable seizure and therefore constitutional. See W. LaFave, Search and Seizure § 10.8(d) (2d ed. 1987).
One of the principal factors necessary for a reasonable seizure by means of a DWI roadblock is the establishment and promulgation of administrative procedures which serve to limit the discretion of field officers. This safeguard assures that officers conducting the roadblock are not acting with unbridled discretion to select randomly and arbitrarily the cars which are to be stopped.[2]
Perhaps the next most important factor for a reasonable seizure under a DWI roadblock procedure is the requirement of prior supervisory approval of the location and duration of the roadblocks. Such prior supervisory approval serves to prevent a field officer from conducting roving roadblocks of brief duration which may in effect amount to the discretionary selection of vehicles to be stopped.
There may be other factors, such as the physical set-up of the roadblock and the length of detention of each motorist, which enter into the reasonableness equation that ultimately controls the decision on constitutionality.
The present decision involves only the constitutionality of one particular DWI roadblock and is rendered under this court's adjudicatory authority. La. Const. art. 5, § 5. The court was not called upon to decide whether to approve or disapprove of the establishment of rules (or guidelines) for conducting valid DWI roadblocks either by the Legislature or by law enforcement agencies. Of course, this court is reluctant to draft such guidelines under the court's supervisory authority. See State v. Goutro, 444 So.2d 615 (La.1984) (Lemmon, J., concurring). This court seldom establishes rules to govern police conduct.[3] If such *1305 guidelines are to be established as a matter of policy, it would be preferable for the Legislature or for state or local law enforcement authorities to adopt and promulgate uniform rules and regulations for conducting DWI roadblocks (just as rules and regulations have promulgated for conducting breath tests to determine alcohol content).[4] The courts could then decide the validity of a particular DWI roadblock by determining (1) the sufficiency of the rules and regulations for generally insuring the constitutionality of the procedures conducted pursuant thereto and (2) the compliance of the particular DWI roadblock with the established rules and regulations.[5]
For emphasis, I restate that resolution of the issue before the court in this case (the reasonableness of this particular seizure) did not require a holding that DWI roadblocks conducted in compliance with proper procedures are unconstitutional and, indeed, this decision does not so hold.
MARCUS, Justice (dissenting).
Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) provided that: "Questioning of all oncoming traffic at roadblock-type stops is one possible alternative" to random stops. This is what happened here. The roadblock had been set up about 12:30 a.m. and closed about 3:30 a.m. Officers were instructed to stop every car and to investigate any odor of alcohol. The area was well-lighted and had ample room for cars to be waved to the shoulder. Defendant was stopped during the course of this roadblock. I consider roadblocks a proper law-enforcement tool to detect and deter drunken drivers and efficient enough to justify the minimal intrusion on individual privacy. There was no unbridled discretion on the part of the officers. Rather, they were instructed to stop every car. The setup of the roadblock was in the early morning hours and the areas was well lighted. Hence, it did not intrude greatly on the convenience of the public. Under these circumstances, I find that the stop was reasonable. Accordingly, I respectfully dissent.

ON REHEARING
Rehearing denied with per curiam.
The court on original hearing decided the question of whether the DWI roadblock in the present case was conducted in an unconstitutional manner. The question remains open whether other DWI roadblocks, conducted under guidelines approved in other jurisdictions, are violative of the Louisiana Constitution.
COLE, J., subscribes to additional concurring reasons. In my view DWI roadblocks, properly conducted with adequate safeguards, are not violative of the Louisiana Constitution.
MARCUS, J., would grant a rehearing for reasons assigned in his dissent but alternatively joins in the concurring reasons in the denial of rehearing.
DIXON, C.J., and WATSON, J., would deny.
NOTES
[1] 501 So.2d 765 (La.1987).
[2] 516 So.2d 362 (La.1988).
[3] 515 So.2d 464 (La.App. 1 Cir.1987).
[4] The consent form advises an arrestee of the right to counsel with a caveat: "NOTE: IF YOU REFUSE THE TEST UNTIL YOU CAN TALK TO A LAWYER, YOU WILL STILL LOSE YOUR LICENSE."
[5] U.S. Const. amend. IV provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."
[6] LSA-Const. 1974 Art. I, § 5 provides:

"Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures or invasion of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court."
[7] 440 U.S. at 662, 99 S.Ct. at 1400.
[8] 440 U.S. at 663, 99 S.Ct. at 1401.
[9] Nelson v. Lane County, 304 Or. 97, 743 P.2d 692 (1987); State v. Boyanovsky, 304 Or. 131, 743 P.2d 711 (1987); State v. Anderson, 304 Or. 139, 743 P.2d 715 (1987).
[10] State v. Koppel, 127 N.H. 2861, 499 A.2d 977 (1985).
[11] Webb v. State, 739 S.W.2d 802 (Tex.1987).
[12] Com. v. Leninsky, 360 Pa.Super 49, 519 A.2d 984 (1986); Com. v. Tarbert, 348 Pa.Super 306, 502 A.2d 221 (1985).
[13] Ingersoll v. Palmer, 43 Cal.3d 1321, 241 Cal. Rptr. 42, 743 P.2d 1299 (1987).
[14] In State v. Severance, 108 N.H. 404, 237 A.2d 683 (1968), a roadblock was found to be constitutionally valid as a check for licenses and registrations but not as a subterfuge for uncovering evidence of criminal activity.
[15] State v. Olgaard, 248 N.W.2d 392 (S.D.1976) held a temporary roadblock unconstitutional for lack of a warrant and decided that a judicial warrant may substitute for individualized suspicion in the operation of a DWI checkpoint.
[16] 502 A.2d 221 at 226.
[17] United States v. Pritchard upheld a roadblock in New Mexico to check drivers' licenses and car registrations. The officers were physically unable to stop all westbound vehicles because of traffic congestion, but the court held that a 100% roadblock is not necessary to comply with Prouse.
[18] United States v. Miller did not involve a sobriety roadblock but a checkpoint for drivers' licenses and vehicle registrations near a Border Patrol checkpoint.
[19] In Obregon, the roadblock checked drivers' licenses and car registrations.
[20] Roberson upheld the right of a police officer to ask the name of a car passenger he recognized as one of two brothers.
[21] In Meitz, a stationary registration checkpoint designed to detect auto theft was upheld.
[22] In Miller v. State all individuals traveling on a particular highway were stopped for drivers' license checks because of a report that employees of two nearby factories were driving without licenses. The officers stopped Miller's automobile, detected the odor of marijuana, and detained the automobile. In Miller, there was a particular reason for the roadblock site and all drivers were checked, making the detention reasonable under the Fourth Amendment.
[23] In John BB., all automobiles in a sparsely populated, heavily burglarized area were stopped in a nonarbitrary, nondiscriminatory and uniform procedure, held to be reasonable under the Fourth Amendment.
[24] Halverson involved a wildlife checkpoint intended to detect illegal game animals.
[25] See State v. Marchand, 104 Wash.2d 434, 706 P.2d 225 (1985) where the court found the unconstrained and unfettered discretion condemned by Prouse and held that a stop for drivers' licenses, vehicle registrations, and equipment was not shown to contribute to highway safety and therefore was not sufficiently productive to justify the intrusion.
[26] 459 U.S. at 558, 103 S.Ct. at 920, 74 L.Ed.2d at 755. The statement originated in Perez v. Campbell, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed. 2d 233 (1971).
[27] People v. Scott, 63 N.Y.2d 518, 483 N.Y.S.2d 649, 473 N.E.2d 1 (1984) also held that a sobriety roadblock was efficient enough in detecting and deterring drunken drivers to justify the minimal intrusion on individual privacy.
[28] The Supreme Court of Maine disagrees and has held that neither a written policy nor supervision is essential. State v. Cloukey, 486 A.2d 143 (Me.1985). This unique position ignores the requirements of Brown and Prouse: "neutral limitations" and "neutral criteria".
[29] See People v. Bartley, 109 Ill.2d 273, 93 Ill. Dec. 347, 486 N.E.2d 880 (1985).
[30] A dissenting Judge in Deskins noted that the four hour roadblock which stopped 2,000 to 3,000 vehicles produced only fifteen intoxicated drivers, at the expenses of 140 man hours, and therefore the state did not establish that the roadblock was the most effective way to detect and deter drunken drivers.
[31] Lowe v. Com., 230 Va. 346, 337 S.E.2d 273 (1985), cert. den. 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720, upheld a sobriety roadblock where the officers received special training; there was extensive media publicity about the roadblock; and every southbound vehicle was halted. The operation was found to be safe and objective, employing neutral criteria which limited the discretion of the field officers.
[32] State v. Jones, 483 So.2d 433 (Fla.1986) held that written guidelines are essential for a constitutional roadblock.
[33] State v. Coccomo, 177 N.J.Super 575, 427 A.2d 131 (1980) upheld the constitutionality of a roadblock which followed the written policy of a town police department. The policy called for stopping every fifth vehicle during light traffic hours to check for driver's license, registration, insurance, and intoxication. The road in question had become a dangerous thoroughfare because of the large number of intoxicated drivers using it and the program took place in the early morning hours when local taverns were closing and traffic was light. Because the system was objective and neutral with no discretion, the town's procedures were found to be constitutional.
[34] Lust relied on People v. Estrada, 68 Ill.App.3d 272, 24 Ill.Dec. 924, 386 N.E.2d 128 (1979), cert. den. 444 U.S. 968, 100 S.Ct. 459, 62 L.Ed.2d 382, in holding that discretion over traffic congestion by field officers is not contrary to Prouse.
[35] Hilleshiem said the minimal requirements for a vehicle stop are: "(1) a checkpoint or roadblock location selected for its safety and visibility to oncoming motorists; (2) adequate advance warning signs, illuminated at night, timely informing approaching motorists of the nature of the impending intrusion; (3) uniformed officers and official vehicles in sufficient quantity and visibility to `show ... the police power of the community;' and (4) a predetermination by policy-making administrative officers of the roadblock location, time, and procedures to be employed, pursuant to carefully formulated standards and neutral criteria." 291 N.W.2d 314 at 318.
[36] Note, Curbing the Drunk Driver under the Fourth Amendment: The Constitutionality of Roadblock Seizures, 71 Geo.L.J. 1457, 1486 (1983) suggests some requirements for a roadblock which meets the requirements of the Fourth Amendment:

"The DWI roadblock is an effective law enforcement tool for preventing the destruction of life and property on the highways by drunk drivers. The fourth amendment requires that the seizure and possible search of motorists at DWI roadblocks be reasonable. DWI checkpoint operations limited by specific safeguards minimizing the intrusion on detained motorists may satisfy the reasonableness requirements of the fourth amendment. Police discretion during checkpoint operations must be limited in order to minimize subjective intrusiveness. The physical circumstances surrounding roadblock stops should also serve to dispel the fear of motorists detained at a sobriety checkpoint. A warrant requirement prevents the arbitrary location of DWI checkpoints and guarantees that checkpoint procedures will minimize the subjective intrusiveness of stops. Because the extended DWI investigation exceeds the brief and routine detention justified by regular checkpoint operations, field officers must have reasonable suspicion to subject a detained motorist to an extended investigation. Allowing the use of the DWI roadblock while properly regulating the scope of its intrusion strikes the proper balance between DWI enforcement and the protection of fourth amendment liberties."
[37] 515 So.2d at 467-468.
[38] See State v. Hernandez, 410 So.2d 1381 (La. 1982).
[39] Hargrave, The Declaration of Rights of the Louisiana Constitution of 1974, 35 La.L.Rev. 1, 20 (1974).
[40] See Koppel, supra.
[41] Compare the Louisiana Stop and Frisk Law (LSA-C.Cr.P. art. 215.1) which requires reasonable suspicion of criminal activity.
[42] LSA-Const. 1974, Art. I, § 13.
[1] The purpose of the stop in a DWI roadblock is to permit the officer to check the driver in order to detect the presence of objective indicia of alcohol influence. If such indicia are sufficiently apparent to give rise to probable cause to believe that the driver is operating the vehicle under the influence of alcohol, then the officer may, under traditional Fourth Amendment standards, arrest the driver and subject him to various tests pursuant to La.R.S. 32:661 et seq.
[2] The decision in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), held that the random stopping of vehicles to check drivers licenses was unreasonable. Nevertheless, the Court noted that the holding did not preclude states from developing less intrusive methods of conducting spot checks that do not involve unconstrained exercise of discretion, suggesting that "[q]uestioning of all oncoming traffic at roadblock-type stops is one possible alternative". Id. at 663, 99 S.Ct. at 1401.
[3] The United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), invoked its supervisory authority to establish a prophylactic rule governing admissibility of confessions and thereby to establish rules governing police conduct in securing confession. Nevertheless, the Court later recognized that a voluntary confession secured in violation of the supervisory rules of Miranda is not constitutionally required to be excluded for all purposes. See Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

This court arguably invoked its supervisory authority in State ex rel Jackson v. Henderson, 260 La. 90, 255 So.2d 85 (1974), to establish minimum requirements for judges in taking guilty pleas. Of course, that decision did not attempt to establish rules for police conduct.
[4] The inclusion of such factors as advance publication of the fact (but not necessarily the location) of DWI roadblocks might in itself serve as a deterrent for drunken driving and might increase public acceptance of roadblocks. While no single factor is necessarily determinative of reasonableness, the inclusion of safeguards against unbridled discretion in field officers weighs most heavily in tilting the balancing test in favor of reasonableness.
[5] In State v. Rowell, 517 So.2d 799 (1988), this court did not hold that blood tests for alcohol content can never be conducted under proper procedures, but rather held that the regulations then in effect were insufficient to insure the reliability of the test results which could otherwise be used in court to conclusively establish drunkenness.