688 So.2d 685 (1997)
STATE of Louisiana, Plaintiff-Appellee,
v.
Steven Lyle VIKESDAL, Defendant-Appellant.
No. 29043-KA.
Court of Appeal of Louisiana, Second Circuit.
January 31, 1997.
*686 John Di Giulio, Baton Rouge, for Defendant-Appellant.
Richard Ieyoub, Attorney General, Don M. Burkett, District Attorney, Charles B. Adams, Assistant District Attorney, for Plaintiff-Appellee.
Before MARVIN, C.J., and GASKINS and PEATROSS, JJ.
MARVIN, Chief Judge.
After entering a Crosby plea to possession of marijuana with intent to distribute after his motion to suppress was denied, Steven Vikesdal appeals to question the constitutionality of the Logansport police's seizure of more than eight pounds of marijuana from luggage Vikesdal possessed as a passenger aboard a routinely scheduled public bus traveling from Houston through Logansport. Vikesdal's destination was beyond Logansport. La.R.S. 40:966; State v. Crosby, 338 So.2d 584 (La.1976).
Without either a search warrant or probable cause to search without a warrant, Logansport police caused the bus to stop at the police station to enable them to search the luggage in possession of the passengers on the bus.
We reverse and render judgment sustaining the motion to suppress and remand.

DISCUSSION
This scheduled bus travels through Logansport, sometimes stopping there if passengers board or debark in Logansport, to a final destination that is undisclosed in this record. While the record does not disclose whether the bus was scheduled to stop in Logansport at 5:40 a.m. on the day in question, we shall assume, for discussion purposes, that it was so scheduled to stop.
When the bus drove into Logansport about 5:40 a.m. on December 13, 1994, the police chief signaled the bus driver to stop in front of the Logansport police station. The routing supervisor of the bus company (Kerrville Bus Lines) had earlier agreed to this procedure, according to the chief. Once the bus was stopped, the armed and uniformed police would then surround and enter the bus with *687 a trained dog which would "work" the bus by sniffing the luggage of the passengers on the bus. Officers outside the bus would watch for suspicious moves or contraband being discarded by passengers. The Logansport police chief explained that searches were sometimes made after Logansport police had been informed that one or more passengers might be transporting contraband aboard the bus.
The chief also explained that because the bus station is located behind the police station on a street parallel to the street on which the police station is situated, the police sometimes stop the bus in front of the police station by a pre-arranged signal for the convenience of the bus driver:
The stop for [the bus] is right behind the police station[;] we stop it there in front of the police station so it don't have to make a circle, so he can ... make his circle right through by the police station and be headed out, headed North, and if he turns in in front [sic] of the station, he has to back up and turn around and go out so it's more convenient for them for us to do it that way. (Our emphasis and brackets.)
The chief said that the bus is sometimes directed to stop "on a random basis" while at other times it is stopped when "informants call and say certain people are coming in with drugs on the bus." The chief acknowledged that the stop of Vikesdal's bus was simply a random stop.
Within a six-week period surrounding Vikesdal's arrest on December 13, 1994, such random stops and searches incriminated four other bus passengers in separate instances who were subjected to similar searches and were charged with a crime. Each of these five defendants, including Vikesdal, filed a motion to suppress. The hearings on these motions were held in the trial court on the same day, but each was separately tried. Some of the details of the police procedure were not repeated by police witnesses in every case, but the trial court apparently considered those details in separately ruling on each motion. The trial court agreed with Vikesdal's request that the record in his appeal should be supplemented with the transcript of the other cases so that the details of the procedure considered by the trial court might be included in Vikesdal's appellate record. We summarize some of the details as to how the procedure was implemented.
After the bus driver obeyed the chief's directions and stopped at the police station, the chief and the dog handler, in uniform and armed, with the trained dog, approached the bus while other uniformed and armed officers (four to five) surrounded the outside of the bus. The chief entered the bus first, explaining to the passengers his purpose and telling them to remain in their seats while the dog "worked." Passengers were asked to remove their luggage from the upper luggage rack and place it in the center aisle of the bus, otherwise the chief would do this. Passengers were also directed not to be afraid of the dog and not to move around or frighten the dog who might "bite" when "working" if alarmed.
Once these instructions were given and the luggage was on the floor, the dog was allowed to enter with his handler and "work" the bus. In one of the companion cases, Ammons, who had been seated near the rear of the bus, attempted to depart the bus while the dog was working. The chief stopped her, telling her to return to her seat for her own safety because of the dog's presence on the bus.
While "working" Vikesdal's bus under the described circumstances on the December early morning, the dog "alerted" on Vikesdal's luggage. Police opened the luggage, finding the marijuana, after Vikesdal declined the police request that he consent to the search. This resulted in the seizure of the marijuana without a warrant and in Vikesdal's arrest.
The police chief explained how passengers were detained:
Some of them get off to smoke, but ... if someone got off the bus and didn't have a ticket to get off in Logansport I would ... anybody would be suspicious why they got off the bus.

Q. Would you prevent them from leaving?
A. I probably would.... I would ask them for identification and I would ask *688 them why were they getting off there and... I would tell them what we are doing and ask them where their baggage [was] and ... why [they were] leaving [their bags on the bus].... [I]f they [still] wanted to get off the bus then I would ... check ... and make sure [they were] not a burglar or something that is fixing to ... get off the bus there and then go and rob something or kill somebody ... [in] the town ... [If they] checked ... out ... okay, ... then I would let them off the bus [without their bags]. We have had that to happen where a subject ran that had drugs on the bus.... (Our emphasis and brackets.)

WAS THERE AN UNREASONABLE SEIZURE?
La. Const. art. I, § 5 (1974) affords even a passenger on a public bus the guarantee against "unreasonable searches, seizures or invasions of privacy [of his person and effects]," a guarantee that is broader for the citizen and more restrictive on the government than is provided in the Fourth Amendment to the U.S. Constitution. See and compare Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); State v. Church, 538 So.2d 993 (La.1989); and State v. Parms, 523 So.2d 1293 (La.1988). See generally Wayne R. LaFave, Search and Seizure (3d ed. 1996) §§ 1.5, 2.2(f), 9.3(c).
The state does not dispute that the police stopped the bus at the police station and boarded it solely for the purpose of allowing the drug-detecting dog to "work" the passengers' luggage without having probable cause or reasonable suspicion that Vikesdal or anyone on the bus had been, was or was about to be, possessing contraband or engaged in any other criminal activity.
The state argues that the stop was "reasonable" on these grounds:
Traveling on a public carrier, Vikesdal's expectation of privacy was "significantly reduced from the expectation he would have traveling in a private automobile."
The corporate owner and operator of the bus, Kerrville Bus Lines, "has consented to the routine examination of the bus for the presence of narcotics."
Under the above circumstances, police officers did not have to show an articulable suspicion in order to use the narcotics detection dog.
The state contends that Vikesdal's encounter with the police when they stopped the bus and brought the drug-detecting dog on board was "not coercive," saying: "There simply was no seizure of the defendant until the drugs were located in his luggage." On this record, we cannot agree.
Under both the state and federal constitutions, a "seizure" occurs when the totality of the circumstances surrounding a citizen's encounter with the police indicates that a reasonable person would not feel free to decline the officers' requests or otherwise terminate the encounter. State v. Haygood, 26,102 (La.App. 2d Cir. 8/17/94), 641 So.2d 1074, writ denied; Florida v. Bostick, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).
Under the circumstances above describedhaving the bus stop at the police station and being confronted with at least six uniformed police officers (Clark and the dog handler on the bus, and another four or five officers surrounding the bus)we have no difficulty concluding that a reasonable bus passenger would not "feel free to decline" the police chief's "requests" or otherwise terminate the encounter. The chief explained that a passenger's attempt to leave the bus or terminate the encounter would provoke further questioning as to the reason for the passenger's desire to leave. Passengers who tried to end the encounter by exiting the bus after the dog boarded the bus did so at the risk of being physically harmed by the dog, according to Clark, who admitted that the dog's presence prevented one such passenger from exiting the bus, notwithstanding her desire and attempt to do so.
The police conduct in this case was far more aggressive and obtrusive than the mere approaching of a citizen in a public place, such as an airport or a bus terminal, to "ask a few questions" or make other requests which the citizen may reasonably and freely choose to disregard. Compare Haygood and Bostick, both cited supra; State v. Shy, 373 *689 So.2d 145 (La.1979). Vikesdal was clearly "seized" or detained in the constitutional sense, under either or both the federal and state constitutions, when police stopped and took charge of the bus, however briefly, to allow the drug-detecting dog to "work" the bus. The more critical issue is the second part of the constitutional analysis in the light of the case law, whether the seizure was "unreasonable." See Church and Parms, both cited supra.

Expectation of Privacy
While vehicular travelers in general may have a reduced expectation of privacy while on the road than they have within the confines of their home, they do not abandon all constitutional protection by entering a vehicle, whether public or private. See and compare State v. Parker, 355 So.2d 900 (La. 1978); State v. Parms, supra; Florida v. Bostick, supra; and Delaware v. Prouse, supra. Both Prouse and Parms recognized that an automobile traveler's freedom from unreasonable seizure cannot be interfered with even for a limited time at the unbridled discretion of police officers, within the contexts of random and suspicionless stops of automobiles to check for driver's licenses and vehicle registration, and additionally, in Parms, for evidence of driver intoxication.
The court in Bostick expressly declined to apply "a lesser degree of constitutional protection to those individuals who travel by bus, rather than by other forms of transportation... [such as] trains, planes, and city streets." 501 U.S. at 438, 111 S.Ct. at 2388.

Consent of Bus Company
The state cites no authority for its contention that Vikesdal's constitutional right to be free from unreasonable seizures of his person could be validly waived by the Kerrville Bus Lines' consent to the random stopping of its buses at the Logansport police station. We assume for discussion purposes, without finding, that such consent was given by Kerrville. This factual assumption, however, does not resolve the validity or legal efficacy of such consent.
The state and federal constitutional prohibitions against unreasonable searches and seizures protect reasonable expectations of privacy of a citizen and objects in his possession regardless of where the seizure occurs. State v. Abram, 353 So.2d 1019 (La.1977), U.S. cert. denied; U.S. v. Poole, 307 F.Supp. 1185 (E.D.La.1969). When the seizure is of the defendant's person, or an object in his possession, rather than an article of property over which the defendant and a third party may share authority, the expectation of privacy, and the right to waive it, belong exclusively to the defendant, in our view. Compare State v. Rawls, 552 So.2d 764 (La.App. 1st Cir.1989); State v. Melbert, 140 (La.App. 3d Cir. 11/30/94), 649 So.2d 740.

Articulable Suspicion Requirement
The distinction between the defendant's person and his property is also significant for determining whether articulable suspicion was required for police to stop the bus at the police station for the purpose of allowing the police to enter and surround the bus and the drug-detecting dog to sniff the luggage in a passenger's possession.
This court and other courts, state and federal, beginning with U.S. v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), have held that in some circumstances a "drug sniff" of an object by a dog trained to detect illegal drugs is not a "search" in the constitutional sense. See, for example, State v. Walker, 530 So.2d 1200 (La.App. 2d Cir. 1988), writ denied; State v. Paggett, 28,843 (La.App. 2d Cir. 12/11/96), 684 So.2d 1072; and U.S. v. Beale, 736 F.2d 1289 (9th Cir. 1984), cert. denied. More precisely, the court's holding in Place was that the Fourth Amendment does not prohibit the warrantless and temporary detaining by police of "personal luggage for exposure to a trained narcotics detection dog on the basis of reasonable suspicion that the luggage contains narcotics." 462 U.S. at 698, 103 S.Ct. at 2639; our emphasis. Analogizing such a brief and limited detention and examination of a citizen's property to an investigatory stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the court in Place concluded:
... [W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains *690 narcotics, the principles of Terry and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.
462 U.S. at 706, 103 S.Ct. at 2644; our emphasis.
The Terry standard is codified in Louisiana in La.C.Cr.P. art. 215.1, which allows a police officer to "stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense," and to demand that the person identify himself and explain his actions. Our emphasis. "Reasonable suspicion" is something less than "probable cause," and something more than a mere hunch or vague possibility that the person "could" be involved in unlawful activity. Terry, supra, 392 U.S. at 26-29, 88 S.Ct. at 1883; State v. Williams, 421 So.2d 874 (La.1982); State v. Shrader, 593 So.2d 457 (La.App. 2d Cir. 1992), writ denied.
Notwithstanding that the Place court explicitly recognized the need for "reasonable suspicion" to justify the initial detention of a person's luggage for the purpose of conducting a canine "sniff test," some appellate courts have construed Place and its progeny, including U.S. v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), as negating the articulable suspicion requirement to detain property for screening by a drug dog. See U.S. v. Beale, supra; State v. Philippoff, 588 So.2d 778 (La.App. 4th Cir.1991); and State v. Rose, 607 So.2d 974 (La.App. 4th Cir.1992), writ denied. Except for Jacobsen, which involved a chemical "field test" of a white powdery substance contained in a damaged Federal Express package, each of these cases involved the screening of packages by a drug-detecting dog. In all of these cases, however, including Jacobsen, the packages that were detained for drug screening or testing were not in the defendant's possession at the time, having been shipped by U.S. mail (Philippoff) or by a private parcel carrier (Rose, Jacobsen). The defendant Beale arrived at the airport with his luggage but checked his bags with the airline before boarding the plane. Beale himself was not detained, "even for a moment," by the canine sniff of his bags, which occurred in the checked baggage area. 736 F.2d at 1292.
In this case, however, Vikesdal was in possession of his luggage on the bus and was detained when the bus was stopped by police at the police station to conduct the canine screening of his and the other passengers' bags. In circumstances where the defendant is detained for some or all of the police encounter which includes the screening of his property by the drug dog, the legality of detaining the defendant before the sniff test is conducted presents an issue which is separate and distinct from the legality of the police conduct, human and canine, which occurs after the initial stop. See and compare U.S. v. Place, supra, 462 U.S. at 699, n. 1, 103 S.Ct. at 2640, n. 1; State v. Paggett, supra; State v. Gant, 93-2895 (La. 5/20/94), 637 So.2d 396; State v. Alonzo, 587 So.2d 136 (La.App. 2d Cir.1991). In each of these cases, the initial stop of the defendant was found to have been based on an individualized and articulable observation or suspicion of past, present or future criminal conduct by the defendant, whether drug-related or simply a traffic offense.
The state has not cited any case, state or federal, upholding the seizure or detention of the defendant's person for the sole purpose of subjecting his property to a canine sniff test in circumstances where the police have no individualized grounds of whatever degree, probable cause or reasonable suspicion, to believe that the defendant or his property has been, is, or is going to be, engaged in criminal activity. Notwithstanding the Logansport Police Department's laudable goals of detecting and deterring the bringing of illegal drugs into the city and the state by interstate bus travelers, the random and suspicionless stopping of the Kerrville bus at the police station is analogous, in our view, to the random and generalized stopping of motorists at the unfettered discretion of the police, to seek evidence of either or both expired driver and vehicle documentation and driver intoxication, which was found to violate the Fourth Amendment to the U.S. Constitution in State v. Parms and Delaware v. Prouse, cited supra.
*691 Both Parms and State v. Church, supra, recognize that Art. I, § 5 of the Louisiana Constitution explicitly protects an individual's right to be free from unreasonable "invasions of privacy," in addition to the protection against unreasonable searches and seizures. The state constitution thus affords greater protection of an individual's "right to be let alone" than does the Fourth Amendment. Parms, 523 So.2d at 1303; Church, 538 So.2d at 996-97. As a result of this expanded protection under the state constitution, the stopping of motorists at sobriety checkpoints or DWI roadblocks, even when the roadblocks are carefully regulated and governed by neutral criteria, rendering them "reasonable" under the Fourth Amendment, is considered "unreasonable" and therefore prohibited by Art. I, § 5 of the Louisiana Constitution. See and compare Michigan v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) and State v. Church, supra. See also State v. Ellis, 95-1663 (La. App. 4th Cir. 9/28/95), 662 So.2d 159, suppressing evidence obtained from defendant's vehicle during a systematic but suspicionless stop of every fourth vehicle to check for driver's licenses.
LaFave's Search and Seizure, cited supra, discussing the many cases before and after Place, supra, that involve sniff tests of the luggage of travelers, makes these conclusions:
It is extremely important to recognize that the Place holding does not validate the use of drug detection dogs in all circumstances. The Court said only "that the particular course of investigation that the agents intended to pursue hereexposure of respondent's luggage, which was located in a public place, to a trained caninedid not constitute a `search' within the meaning of the Fourth Amendment." For one thing, this means that if an encounter between the dog and a person or object is achieved by bringing the dog into an area entitled to Fourth Amendment protection, that entry is itself a search subject to constitutional restrictions. For another, it means that if the place is public but the encounter can be accomplished only by a temporary seizure of the person or object, then the encounter will again be constitutionally impermissible unless there are Terry-Place grounds for such a seizure or it is ... permissible under ... some other theory. In that connection, it is well to note that the use of a drug sniffing dog against ... effects in possession of a person may itself be an important consideration in determining that an illegal seizure had occurred and that the dog sniff is a fruit thereof.
... In [Place], it is well to recall, the court addresses only the situation of exposure of luggage to the dog in the suspect's absence [and not] a sniff directed at objects being carried by the person ... in an airport corridor [or other public place where the dog's positive reaction amounts] to a public accusation of crime.
§ 2.2(f), at pp. 456-58, as supplemented in 1997. Emphasis and brackets supplied; footnotes omitted.

CONCLUSION
As in Church, the seizure of the defendant's person here occurred without any reasonable suspicion or probable cause to believe that the defendant or anyone else on the bus had violated some law, in contravention of La. Const. art. I, § 5 and La.C.Cr.P. art. 215.1. The marijuana obtained from Vikesdal's luggage as a result of this unlawful seizure is not legally admissible.

DECREE
We reverse the judgment denying Vikesdal's motion to suppress and render judgment granting the motion. Vikesdal's conviction and sentence resulting from his conditional guilty plea are vacated, and the case is remanded to the district court.
REVERSED, RENDERED AND REMANDED.