(977 P.2d 276)

No. 81,435

STATE OF KANSAS, *Appellant*, v. CHRISTOPHER J. KIMBERLIN, *Appellee*.

Opinion filed March 12, 1999.

*Vernon E. Buck*, assistant county attorney, *Joe E. Lee*, county attorney, and *Carla J. Stovall*, attorney general, for the appellant.

*W. Irving Shaw*, of Emporia, for the appellee.

Before BRAZIL, C.J., LEWIS, J., and ROGG, S.J.

LEWIS, J.: This is an interlocutory appeal by the State of Kansas from an order of the trial court granting defendant's motion to suppress evidence seized from his home.

On the date in question, at about 1:00 in the morning, Melanie Nielson called for the police to respond to her residence. Melanie lived in a home with defendant and apparently had been a resident of that home for some time. At times, defendant would get drunk and violent, and his violence was occasionally directed at Melanie. On one occasion, for example, defendant had shoved her down the stairs and, in the process, had pulled out a handful of her hair.

On this particular evening, Melanie called the police because she was "scared because defendant was acting crazy, going off." In addition, defendant was drunk and was tearing up a roommate's bedroom.

The police dispatcher advised Officer James Tilton and his partner to respond to Melanie's call. In due time, they went to the front door of the house where they were confronted by defendant, who was angry and belligerent. Defendant ordered Officer Tilton and his partner off the premises in a profane diatribe. The police attempted to explain that they had a call about violence in the house and wanted to check it out. Defendant refused to allow them to do so.

The officers left and then came back and again confronted defendant because they heard him yell and scream at a female and needed to see if the female was okay. Again, defendant loudly and profanely ordered the officers to leave. Ultimately, defendant's actions became so severe and so profane that he was arrested for disorderly conduct and taken to jail.

After defendant was removed, Officer Tilton stood at the door of the house, with Officer Jeff Eubank behind him. He began to ask the female occupant to present herself. In time, in response to his request, Melanie appeared and came outside of the home. Melanie and Officer Tilton discussed past instances of abuse by defendant, and Melanie advised Officer Tilton that defendant had done considerable damage to a roommate's room in the house.

At some point in time, Officer Tilton asked if he could see the damage done in the house. Melanie said "yes" and opened the door, and Officer Tilton followed her in, with Officer Eubank following Officer Tilton. Officer Eubank believed that consent to enter had been granted to himself as well as Officer Tilton. He said

he entered the house because, " 'I wasn't going to let him [Officer Tilton] go into the residence by himself, mainly because of the safety issue.' " He later stated that he felt it was necessary to enter the house "for the safety of [Officer] Tilton." Upon entering the house, Officer Eubank quickly discovered a hitherto unknown subject sitting in a chair in the living room. In the process of checking out this individual, Officer Eubank observed what he believed to be marijuana "roaches" in an ashtray. At some point in time, he picked up one of the roaches out of the ashtray and smelled it, confirming in his own mind that it was, indeed, marijuana.

The officers then attempted to obtain a consent from Melanie for a general search of the house. She refused to give this consent. As a result, the officers obtained a search warrant to search the dwelling based on the knowledge gained by Officer Eubank while he was in the house.

The search warrant was executed and yielded quantities of marijuana, LSD, drug paraphernalia, and no drug tax stamps. The trial court's order of suppression bars the entry into evidence of all items seized under the search warrant. The order of suppression is based on the theory that Officer Eubank, who found the marijuana in plain view, was illegally in the house and that any evidence seized as a result of his being in the house was unlawful and should be suppressed. Melanie testified that while she had given Officer Tilton permission to enter the house, she had not given Officer Eubank permission to enter the house.

In granting suppression, the trial court found that while Officer Tilton entered the house lawfully, Officer Eubank did not. The court's order finds the following:

"2. The Court determined that there were two officers at the residence, one being Officer Tilton, whose entrance into the residence was lawful and at the request of the resident, Melanie Nielsen.

. . . .

"4. The question involved in this case is whether Officer Eubank's entrance into the home was with consent. The Court determined that his entrance into the home was without consent and, therefore, unlawful.

"5. The Court further found that there was no exigent circumstances sufficient to warrant Officer Eubank entering into and searching the living room without a warrant."

We do not agree with the trial court's decision. That decision permits the resident to invite one police officer into his or her house while denying permission to a backup officer to enter to protect the first officer. This rule would make a police officer's job, already dangerous enough in entering an unknown residence, to be more hazardous than necessary.

The question before this court is whether a citizen may call the police to his or her home for protection and then grant only one police officer permission to enter the home while denying permission to the officer's backup, who was there to look after the safety of the officer entering the house. We conclude the answer to this question is no. We hold that where there are two or more police officers at a scene, and they have been called to the scene by a resident of the house, and there are allegations of violent behavior in the house, the consent given to one officer to enter the house necessarily, as a matter of law, implies that there is equal consent for adequate backup officers to enter the house as well. Our rule is designed to provide protection for police officers in a dangerous setting in situations where the entry of the backup officer is a minimal intrusion under the circumstances. When the resident of a dwelling invites one police officer into the dwelling, the entry of a backup officer under the same consent is, at best, a minimal intrusion upon the resident's Fourth Amendment rights.

In reaching our decision, we do not question the findings of fact by the trial court. We note there is ample evidence in the record to indicate that Officer Eubank entered the house with permission. We are not, however, factfinders and accept as correct the facts as found by the trial court. Our decision is premised on the fact that Officer Eubank did not receive specific permission to enter the home but that, nonetheless, he did not unlawfully enter the dwelling.

Our concern in this case is officer safety. Melanie did not hesitate to call for police help in the early hours of the morning when defendant was committing acts of violence, and she did not hesitate to accept that help. In fact, she left the dwelling with the police officers, who took her to a safe haven where she would be protected from further violence. Despite the fact that she requested the pres-

ence of the police officers and despite the fact that she invited Officer Tilton into the house, we are asked to conclude that Officer Eubank had no right to be in the house. We believe that he did. Once Melanie invited Officer Tilton into, the house, she also impliedly invited such backup officers as might be necessary to protect the safety of Officer Tilton.

To accept defendant's reasoning means that an officer might be required to enter a dangerous situation alone and without backup. A person whose behavior set in motion the involvement of the police will not be permitted to deny entrance of backup officers after having invited one officer into the home.

Under our constitutional system, the court must constantly balance the rights and privileges of citizens with the safety, of the public and the safety of those individuals who respond to a request for police assistance. If the intrusion into the constitutional rights of the citizen is minimal and the protection of the police officer is vital, then the rule announced in this opinion would apply.

Our Supreme Court recognized the validity of this balance test in *State v. Deskins*, 234 Kan. 529, 541-42, 673 P.2d 1174 (1983). The court was dealing with a roadblock at which drivers of automobiles were stopped without any evidence that they were violating the law. The court held the roadblock to be lawful and, in doing so, employed a balancing test, such as we employ in the instant matter:

"The governing principle of the amendment is that except in certain carefully defined classes of cases, a search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant. *Camara*, 387 U.S. at 528-29. Whether a warrantless search and seizure falls within these limited exceptions is determined by balancing the degree of legitimate governmental interests against the resulting intrusion of the particular law enforcement practice on individuals' Fourth Amendment rights. *Prouse*, 440 U.S. at 654. However, as *exceptions* to the overriding mandate requiring warrants based on probable cause, these 'carefully defined classes of cases' permitting warrantless searches and seizures should be construed narrowly to preserve the integrity of the Fourth Amendment.

"In applying the balancing test of the degree of governmental or public interest against the degree of intrusion upon the individual's constitutionally protected rights, the courts have developed a three-factor test or analysis which was stated in *Brown* as:

'a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.' *Brown v. Texas*, 443 U.S. at 50-51." 234 Kan. at 540-41.

Although the balancing test referred to related to the warrantless search of an automobile, we believe the same reasoning can be applied to a situation in which consent to enter a home is implied for the purposes of safety of the police officers.

In *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), the United States Supreme Court adopted the *Terry* rule, which has since been codified in the state of Kansas. See K.S.A. 22-2402. The *Terry* rule justifies a search for the protection of police officers and others nearby. See *State v. Webb*, 13 Kan. App. 2d 300, 302, 769 P.2d 34 (1989). In this case, we have expanded the reasoning of *Terry*, again for the protection of police officers.

In *Webb*, the same balancing test was utilized. In that case, we said:

"We find *Philadelphia v. Mimms*, 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977), to be controlling. In *Mimms*, the police stopped the defendant's car for operating with an expired license plate. The police asked defendant to step out of the car and produce his license. As defendant got out of the car, the police noticed a large bulge under his jacket. The police frisked defendant and discovered a loaded revolver. The defendant was then arrested. The defendant filed a motion to suppress the revolver as being the fruit of an illegal search. The trial court denied the motion and convicted defendant, who appealed his conviction. The Pennsylvania Supreme Court reversed the conviction, holding the search violated the Fourth Amendment 'because the officer's order to respondent to get out of the car was an impermissible "seizure." ' *Mimms*, 434 U.S. at 107-08.

"The United States Supreme Court disagreed with this conclusion and held the order to get out of the car was reasonable and permissible under the Fourth Amendment. The Court attempted to balance two interests. The first was the officer's interest in personal safety and the second was the intrusion into the driver's personal liberty occasioned by the order to get out of the car. *The court found the first interest to be 'both legitimate and weighty.'* *Mimms*, 434 U.S. at 110. The court recognized the risks facing an officer who approaches a person seated in a car and the hazards of accidental injury from passing traffic if the officer is standing exposed. As to the other interest, the court found the additional intrusion of asking the driver to get out of the car to be 'de minimis.' The court concluded: 'What is at most a mere inconvenience cannot prevail when balanced

against legitimate concerns for the officer's safety.' *Mimms*, 434 U.S. at 111." (Emphasis added.) 13 Kan. App. 2d at 302-03.

In *State v. Tucker*, 19 Kan. App. 2d 920, 878 P.2d 855, *rev. denied* 255 Kan. 1007 (1994), we balanced the rights of an individual to privacy and freedom of movement with the rights of the public to be protected from unreasonable dangers. We concluded that under that balance, the rights of the public to be protected from unreasonable danger were superior. Accordingly, we permitted a motor vehicle to be stopped by a law enforcement officer based on an anonymous tip.

In *State v. Mayfield*, 10 Kan. App. 2d 175, 178, 694 P.2d 915 (1985), we dealt with police officers who were faced with a hostile and belligerent individual. At one point during the confrontation, the individual went to his apartment to get his identification. The officers, although uninvited, followed him into the apartment. While in the defendant's apartment, the officers observed drugs in plain view and seized them. The defendant argued that the search was unlawful. We permitted the search in the interests of the safety of the police officer and said:

"This is the same consideration for the *Terry* justification of a 'frisk' of a subject even in the absence of probable cause. Only 'unreasonable' searches and seizures are prohibited by the Fourth Amendment. *Concern for the officer's safety justifies such a limited intrusion on the subject's expectation of privacy and is not 'unreasonable' even though the person is only suspected of crime.*" (Emphasis added.) 10 Kan. App. 2d at 178-79.

We concede that most of the decisions utilizing the balancing test deal with motor vehicles. But the one in *State v. Mayfield* is similar to the case at hand. We have applied the balancing test to these facts. In this case, the degree to which the admission of Officer Tilton's backup officer into the house contributed to his safety appears to be very high. It is well known that officers are frequently subjected to violence when entering homes where violence is taking place. Officer Eubank was able to see and detain a subject whose presence in the house was not known. This subject could very well have been a considerable risk to the safety of Officer Tilton. The interference with the individual liberty of those living in the dwelling by allowing a backup to enter the house to look

after the safety of another officer is de minimis. Melanie invited one officer into her home, and it is not a great intrusion to hold that this admission impliedly permitted another officer to lawfully enter the home for safety purposes.

We believe that forcing a police officer to enter a hostile area without backup is entirely unreasonable. To permit a backup to enter under the same permission is necessary in the interests of the officer's safety and is a limited intrusion upon the individual's Fourth Amendment rights.

We emphasize that the Fourth Amendment to the Constitution of the United States only protects against *unreasonable searches and seizures*. We do not consider the presence of Officer Eubank in the residence, under the facts stated, to have been unreasonable and conclude that he had the right to be there and that he was justified in observing obvious contraband in plain view while in the process of securing the residence for the protection of Officer Tilton.

We reverse the trial court's order suppressing the evidence and remand the matter for trial.

Reversed and remanded.